**James HAMPTON, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 45S00–8710–CR–959.

Supreme Court of Indiana.

May 3, 1990.

Marce Gonzalez, Jr., Appellate Public Defender, Crown Point, for appellant.

Linley E. Pearson, Atty. Gen., Amy Schaeffer Good, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant was convicted by a jury of one count of Class A felony burglary and was sentenced on that count to forty years. He was also convicted of three counts of Class B felony burglary and was sentenced on those counts to one term of ten years, to run consecutively to the A felony sentence and to two terms of twenty years, both to run concurrently with the other sentences. Appellant therefore received an executed sentence of fifty years, and he brings this

direct appeal. Appellant claims that the trial court erred by denying his motion to suppress evidence of a photo array shown to victims and subsequent identification testimony given pursuant to that array, arguing that the array was impermissibly suggestive. He also claims that the sentence imposed by the trial court was manifestly unreasonable.

The evidence adduced at trial most favorable to the verdict showed that in the early morning hours of July 2, 1986, two homes on Olcott Street in East Chicago were burglarized. Entry into both was made by cutting screens and climbing in ground floor windows. Martha Martinez testified that she was asleep in bed with her five-year-old daughter and that at about 5:30 a.m., she heard a noise at her bedroom window. She started to get up to close the partially open window and saw a young man going through her closet. She started screaming, then her daughter did, and the man told them to shut up or he would kill them.

He demanded money, and Martinez, who does not speak English well, answered him in Spanish. She tried to get up from the bed, but the man would not let her. Her daughter told her to tell him where the money was or that he would kill her. The man put a pillow over Martinez's face, and her daughter started screaming again and told him that her mother hid her money in a purse in the kitchen. The man then grabbed the girl by the wrists and started dragging her toward the kitchen. Martinez got up, and the man released the girl and caught Martinez's hands behind her back and started propelling her toward the kitchen with the five-year-old following behind, begging him not to hurt her mother or baby brother. He located the purse, then released Martinez and ran out the kitchen door. Martinez testified that she observed the intruder by the light of day coming into the house and that he was wearing blue pants, a T-shirt, and tennis shoes. She testified further that a small amount of money, some food stamps, and her personal identification were taken.

Dianne Horton, who lived about a block away from Martinez, testified that at approximately 5:40 a.m., she awakened to the sound of someone crawling across the wooden floor of her bedroom. As she began to stir, a man reached out and put his hand between her legs. Horton stated that light was streaming into the bedroom from a kitchen light and that she looked full into the man's face as he stood over her, then began screaming for her husband to wake up. The man began backing out of the bedroom, and the Hortons chased him through the house until he ran out the front door, jumped off the porch and disappeared. Horton described the intruder as an eighteen- to twenty-year-old man wearing jeans, a white and blue striped shirt, and white gym shoes. She testified further that a small amount of money had been taken from a purse and a wallet.

Four days later, during the early morning hours of July 6, 1986, a series of break-ins was committed within a seven-block radius. Carol Buggs reported that at 4:20 a.m., she heard someone running down her stairs. She ran to her bedroom door and saw, from the back, a young male wearing white tennis shoes run through the back door and vault a fence. Hilda Sosa testified that between 5:00 and 5:15 a.m., she saw that her window screen had been removed and that a young male in a bluish gray shirt had climbed halfway into her house. He abandoned his entry as she yelled at him to get out. Hortensia Calderon testified that at 5:20 a.m., she saw a young man wearing dark blue pants, a blue, short-sleeved dress shirt, white high top tennis shoes, and a blue denim baseball cap in her bedroom. When she called for her husband to get up, the man went out the window. She also testified that the window screen had been removed and that the intruder had stood on a lawn chair to gain access to the window. Sylvia Pulido testified that between 5:35 and 5:45 a.m., she was awakened by the sound of someone going through the drawers of the waterbed in which she and her husband, Jose, were sleeping. She said the man was wearing a short-sleeved, grayish or light bluish dress shirt and blue pants. The man

saw her nudge Jose, then turned and walked out of the room. Jose testified that his wife said, "There's a black man in here." The Pulidos got up and followed the man and saw him go out the back door and jump the fence. About sixty dollars and some food stamps were taken, and Sylvia testified that stamps found on appellant at the time of his arrest were folded in the manner that she typically folded hers. Entry into the Pulido home was made by removing a kitchen window screen. All of these witnesses testified that they observed the intruder by the daylight coming into their homes.

Miriam Perez testified that at approximately 6:00 a.m., she was asleep in bed with her two sons, aged two and three. She felt someone touching her and opened her eyes. A young man wearing a light blue shirt and blue pants told her not to make any noise and asked where she kept her money. When she told him she didn't have any, he grabbed her arm and jerked her off the bed. She began to scream, which awakened her sons, who also started screaming. The man told her to shut the boys up or he would hurt them, and he started pulling her out of the bedroom. Both boys were crying and clinging to their mother's leg, and the man told her to make them stay in the bedroom. Perez testified, "[H]e pulled me towards the bathroom and made the comment that since I didn't have any money, I was going to have to take care of him," and she said that when they got into the bathroom, he made a motion as if to unzip his pants.

The boys were crying, and Perez was unable to quiet them and was begging to be let go. The man pulled her past the bathroom and toward the open back door. Thinking that her neighbors might hear her, Perez began to call for help, and the man struck her repeatedly in the face with his fist. He then pulled her away from the door and back into the children's bedroom. As he reached to close the door, Perez grabbed a small plastic Bambi lamp and hit him in the head with it. He fell back, got back up and struck her a couple of more times in the face, then released her and ran out the back door. Perez called the police,

and an officer responded almost immediately. She gave a description of her assailant, and five to ten minutes later was asked to step outside to view a suspect. She stepped out onto the sidewalk and looked at a man standing next to a police car. She confirmed that the suspect was the man who had broken into her house and beaten her, and at trial she positively identified appellant as her attacker and as the suspect she viewed at the show-up.

Later that morning at the East Chicago Police Department, each of the July 6 victims, including Miriam Perez, was shown the same photo array of six pictures out of the presence of all the other victims. Each picked out appellant's picture and stated positively that he was the man they had seen in their homes. Horton and Martinez, the victims of the July 2 burglaries, were also summoned to the police station and shown the same array. Both identified the photo of appellant as being that of the man who had been in their homes. At trial, the victims again positively identified appellant as the person who broke into their homes.

Appellant was charged with one count of Class A felony burglary for the Perez break-in and with four counts of Class B felony burglary for the break-ins at the Horton, Martinez, Buggs, and Pulido residences. He was acquitted of the Buggs burglary, and convicted and sentenced on the others as noted above.

Appellant first argues that his conviction must be reversed because the photo array shown to the victims was constructed so as to be impermissibly suggestive. Each victim was shown color photographs of six young black men of thin build, all of similar complexion and with short haircuts and little or no facial hair. Appellant contends that the array was impermissibly suggestive because he was photographed in the clothes he was arrested in and his photo is the only one in which the subject was wearing a "dress shirt." Appellant argues that the harm to him was further compounded by the fact that the police had taken his clothes from him to examine for evidence and had requested his sister to bring him a change of clothing, but that he was asked

to redress and was photographed before she had an opportunity to give the fresh clothing to him.

 A photographic array is impermissibly suggestive if it raises a substantial likelihood of misidentification given the totality of the circumstances. *Dumbsky v. State* (1987), Ind., 508 N.E.2d 1274. Mere variation in the appearance of individuals in an array does not automatically render the array impermissively suggestive. *Fraylon v. State* (1989), Ind., 542 N.E.2d 559. A review of the photos at issue here shows that the East Chicago Police Department did a commendable job of assembling a neutral, rather than an impermissibly suggestive, array. All six pictures are single, frontal, waist-up Polaroid snapshots of subjects, rather than mug shots, taped to obscure the identifying prison data, which are more typically displayed to victims. All six men are of similar age and have similar builds, coloring, and hair length. The men in the pictures are dressed as follows: Photo 1—maroon T-shirt with gray paratrooper insignia and lettering; Photo 2—yellow, double breasted jacket, no shirt; Photo 3—slate blue, collarless jersey with blue and gray striped sleeves; Photo 4 (appellant)—blue and white striped button-down shirt; Photo 5—white T-shirt worn under open black zippered jacket; Photo 6—black T-shirt. The variety of color and style of apparel depicted in the array negates appellant's claim that his clothing, as compared to that of the other subjects, was so distinctive as to give rise to a substantial likelihood of misidentification. Further, the police committed no abuse by photographing appellant in the clothes in which he was arrested. The trial court did not err in denying appellant's motion to suppress the evidence of the pre-trial identifications based on the photo array.

Appellant's second claim on appeal is that the sentence imposed by the trial court was manifestly unreasonable. He argues that the court abused its discretion by enhancing his sentence on the A felony burglary by ten years based on its finding of aggravating circumstances. Burglary is a Class A felony if the offense results in bodily injury or serious bodily injury to any person other than the defendant. I.C. 35–43–2–1. The presumptive sentence for a Class A felony is thirty years, which may be enhanced up to twenty years for aggravating circumstances. I.C. 35–50–2–4.

In support of his position, appellant cites *Stowers v. State* (1987), Ind., 512 N.E.2d 853, and *Clay v. State* (1981), Ind., 416 N.E.2d 842, in which presumptive sentences were found to be appropriate for eighteen-year-old felony offenders. Based on these holdings, appellant argues that the imposition of an enhanced sentence on a seventeen-year-old felony offender is manifestly unreasonable. This argument flies in the face of this state's sentencing procedure, which requires that each sentence be imposed based on the nature of the specific crime committed and the nature of the individual defendant presently before the court. Reference to sentences imposed in other cases presenting significant factual similarities is, of course, relevant in assessing the appropriateness of a challenged sentence. Appellant, however, seems to be espousing a standard for reviewing sentences based predominantly, if not solely, on the age of the defendant. This is clearly untenable.

 This Court has the authority to revise a sentence authorized by statute, but will exercise that authority only if the sentence is manifestly unreasonable. Ind.R. App.Rev.Sen. 2. A sentence is not manifestly unreasonable unless no reasonable person could consider the sentence appropriate given the particular offense and the particular offender. *Hill v. State* (1986), Ind., 499 N.E.2d 1103. The trial court found the following to be aggravating circumstances:

1. Appellant had violated the conditions of his juvenile probation, and the nature of the violation was violent and substantial.

2. Appellant had a history of prior criminal or delinquent activity in that he had been charged on ten separate occasions in the Juvenile Court and adjudicated a delinquent in six of

those cases, with prior commitments to Boys School.

3. Appellant was in need of correctional or rehabilitative treatment that can best be provided in a penal institution.

4. The imposition of a reduced sentence would depreciate the seriousness of the crimes in that they were committed at times when the lives and safety of the victims were endangered and that injuries were inflicted in at least one case.

5. The cause currently before the court had resulted in convictions for four separate offenses.

The court found appellant's age to be the sole mitigating factor.

A review of the record reveals that each aggravating circumstance cited by the trial court is well supported by the evidence. Appellant cites *Moody v. State* (1983), Ind., 448 N.E.2d 660, in support of his contention that the ten-year sentence enhancement imposed by the trial court was manifestly unreasonable. In *Moody*, a ten-year sentence enhancement was imposed following a conviction for an attempted robbery which resulted in personal injury. The trial court cited the defendant's prior conviction for robbery and the infliction of injury on the victim as aggravating circumstances justifying an enhanced sentence, and that enhancement was upheld by this Court on appeal. Appellant argues that if a ten-year enhancement is appropriate given these aggravators, his ten-year enhancement must be manifestly unreasonable because he was being tried here as an adult for the first time, and therefore had no prior felony convictions, and because, unlike the defendant in *Moody*, he did not use a deadly weapon in the perpetration of his crimes. These distinctions cited by appellant do have merit; however, in lieu of the specific aggravators present in *Moody*, this case presents discrete circumstances of its own which justify the imposition of an enhanced sentence.

■ Appellant did not, in fact, use a deadly weapon. However, in two of the four burglaries of which he stands convict-

ed, he threatened mothers with harm or death to their children as well as to themselves if they did not cooperate with him. He was also undeterred from his activities by verbal and physical confrontations with his victims; in fact, he initiated two of these confrontations by prodding awake Dianne Horton and Miriam Perez, who might otherwise have slept through the entire episode. Appellant inflicted a severe beating on Perez, which necessitated a hospital examination to determine the extent of her injuries. Photographs of Perez entered into evidence show that appellant blackened both of her eyes, one so severely that the deep discoloration and swelling extended from above her eyebrow to below her cheekbone. The photos also show large, deep bruises on Perez's left shoulder and thigh and on her right arm, and abrasions to her cheek, chin, and neck. There is also evidence which suggests the threat of sexual assault against both Perez and Horton. During his attack on Perez, appellant tried to separate her from her children, told her that since she did not have any money, "[she] was going to have to take care of him," and made a motion to unzip his pants. Horton testified that appellant put his hand between her legs and that, because the bed is in a shadowed part of the bedroom and because she sleeps on the side nearest the door, it is likely that he was unaware that her husband was in bed with her. Given the nature of these offenses, we cannot say that the trial court erred in enhancing appellant's sentence despite the fact that no deadly weapon was used in their commission.

■ Appellant's argument that the absence of prior felony convictions on his record renders an enhanced sentence on the instant offenses manifestly unreasonable also fails. Under I.C. 35–38–1–7(b)(2), a sentencing court is authorized to consider in aggravation the fact that the convicted person "has a history of criminal or delinquent activity," and a defendant's record of adjudications of delinquency may be considered as evidence of a history of delinquent activity. *See Parker v. State* (1989), Ind., 533 N.E.2d 134; *Evans v. State*

(1986), Ind., 497 N.E.2d 919. This record of delinquency in conjunction with the criminal activity attested to by the numerous victims appearing in this cause indicates an extensive history and an ongoing pattern of antisocial behavior and a lack of response to early attempts at rehabilitation. Based on the nature of this offender, the trial court did not abuse its discretion in enhancing the sentence.

■ Appellant invites this Court to reconsider its decision in *May v. State* (1986), Ind., 502 N.E.2d 96, which allows the trial court to consider multiple convictions for multiple offenses as an aggravating circumstance. We decline the invitation as we remain convinced that commission of and convictions for separate, multiple crimes is a valid indicator of the appropriateness of an enhanced sentence.

The conviction and sentence are affirmed.

SHEPARD, C.J., and GIVAN and DICKSON, JJ., concur.

PIVARNIK, J., not participating.