**Frederick Carl BROOKS, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 20S00–8801–CR–25.**

Supreme Court of Indiana.

Sept. 25, 1990.

Rehearing Denied Dec. 3, 1990.

J.J. Paul, III, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Amy Schaeffer Good, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant was tried to a jury and found guilty of two counts of child molesting, a Class A felony, I.C. 35–42–4–3(a). The trial court imposed a thirty-year sentence for each conviction and ordered that the sentences run consecutively, resulting in an executed sentence of sixty years. Appellant now brings this direct appeal, claiming

that the evidence was insufficient to support his conviction, that prosecutorial misconduct warranted a mistrial, and that his sentence is not appropriate.

The following evidence was adduced at trial: On July 15, 1986, B.B. was an eleven-year-old boy living in Goshen. He testified that at about 11:45 a.m. on that day, following a morning Little League doubleheader, he was riding his bike on a bike trail in a wooded area in Shanklin Park. As he approached a footbridge, a man walking toward him asked if the games were over. The two continued moving toward each other as B.B. responded that they were. The man grabbed B.B. and put a gun to his head. After the boy's bike was put in the weeds, the man directed B.B. to start walking into the woods. B.B. offered the man his money, to which the man replied, "I don't want your money, just do what I say and I won't hurt you." He told B.B. where to stop, then grabbed the boy's genitals. B.B. told him to stop, and the man again put the gun to him and said, "Just let me do what I want, you won't get hurt." He performed fellatio on the boy, then forced B.B. to perform fellatio on him. He then told B.B. to turn around and count to 1,000 or wait for five minutes. He also made B.B. give his name and said he could come and get B.B. again if he told anyone about the incident.

Shortly following the assault, B.B. described his attacker as a man who was about thirty, had curly brown hair and a moustache, and was wearing blue jeans and a stained, green t-shirt. He also told police investigators that the man was acne-scarred and might have had a couple of teeth missing. B.B. testified at trial that his attacker held the gun in his left hand. Appellant was thirty-four years old at the time of trial, and he has brown hair and a moustache, but has no acne scars or missing teeth. He is left-handed. In his trial testimony, B.B. pointed out appellant as his attacker.

R.F., a ten-year-old Michigan boy who had been molested, was in a grocery store with his mother in February of 1987, and he told her that his attacker was in the store. She followed the man out of the store and copied his license plate number, which she then turned over to the police. The vehicle was registered to appellant. A lineup was held on February 18, 1987, which B.B. attended. He identified appellant as his attacker at the lineup and again at trial.

Appellant was employed by an exterminating company in July of 1986, and he interposed an alibi defense that he was at a worksite in a neighboring town at the time of the attack. He testified that he arrived at the home of Patricia Rhoades in Nappanee around 11:00 a.m. on July 15 and left at 11:55. He stated that Rhoades left for work between 11:10 and 11:15. Appellant testified that he then drove to a restaurant for lunch and was at his next worksite in Union, Michigan at 1:00 p.m. Rhoades was called by the State and testified that appellant arrived at her home at 10:50 that morning and left at 11:20. She stated that her testimony was based on references to stages in a television game show which she always watched while getting ready for work and which she had on while appellant was there. She also stated that she had to be at work at 11:30, that she usually left at 11:20 or so, that appellant left when she did, and that she was on time to work that morning.

Captain Bickel of the Goshen Police Department testified that he had timed the most probable route one would take from Rhoades's home in Nappanee to Shanklin Park in Goshen, observing all speed limits posted over the 15.1 mile route. Through his testimony, a diagram was entered into evidence which illustrated that, given a departure time of 11:20, appellant would have been able to drive to Shanklin Park and station himself along the bike trail in time to intercept B.B. at 11:45. Bickel also testified that there was an alternate route between the two critical points. He stated that it had not been timed, but that he believed it was one to three minutes faster than the diagrammed route. There was also evidence that the mileage on appellant's company car on July 15 was 152 miles and that the route described on his timesheet for that day covered 116.2 miles.

The State presented the testimony of three other boys who had been molested in parks in northern Indiana and southern Michigan in 1986. Each of these boys had been accosted by a man with a gun, who ordered them not to yell or run and they would not be hurt. D.M., 11, testified that he was molested as he walked through Island Park in Elkhart on his way to school at around 7:45 a.m. on January 6, 1986. He stated that his attacker performed fellatio on him, then ordered the boy to do it to him, but relented for some reason and left after telling D.M. that he knew where he lived and would come and get him if he told. D.M. also testified that his attacker held the gun in his left hand. J.J., 15, testified that as he was riding his bike in Shanklin Park at around noon on April 19, 1986, a man engaged him in conversation near the same footbridge where B.B. was assaulted, then grabbed him and threatened him with a gun. J.J.'s hands were tied with his own shoelaces, then the man stuck his hand into the boy's pants and fondled him. Before making his escape, the man told J.J. not to turn around for five minutes. R.F., the boy whose identification precipitated the lineup, testified that on June 16, 1986, he and his friend, L.D., were forced to submit to and perform fellatio on the man. This assault occurred at French Field in Niles, Michigan between 2:00 and 3:00 p.m. At trial, D.M., J.J. and R.F. identified appellant as the perpetrator of the crimes committed against them. L.D. was not called by either party to testify at trial.

On appeal, appellant raises several challenges to the sufficiency of the evidence supporting his convictions and to the propriety of certain events leading to his arrest and conviction. The standard for reviewing sufficiency claims is well settled. On appeal, this Court does not reweigh the evidence nor judge the credibility of the witnesses, but instead looks to the evidence most favorable to the verdict and to all the reasonable inferences to be drawn therefrom. If, from that viewpoint, there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt, the conviction will be affirmed. *James v. State* (1976), 265 Ind. 384, 354 N.E.2d 236. The testimony of a victim, even if uncorroborated, is ordinarily sufficient to sustain a conviction for child molesting. *Carpenter v. State* (1988), Ind., 523 N.E.2d 407.

Appellant challenges the sufficiency of the evidence serving to identify him as the person who assaulted B.B. in Shanklin Park. The challenge first focuses on B.B.'s ability to have seen and remembered the details of his assailant's appearance and on discrepancies between his pre-trial description of the man who molested him, composite drawings made from this description, and appellant's appearance. The circumstances under which B.B. viewed his attacker and the discrepancies between his description, the composite, and appellant's appearance were fully disclosed to the jury, and it was for them to determine the weight given to the identification evidence and to decide whether it was satisfactory or trustworthy. *Whitt v. State* (1986), Ind., 499 N.E.2d 748.

Appellant also focuses on the testimony from himself and Rhoades that he was wearing his work uniform on July 15 and points out the conflict in evidence between their descriptions of his uniform and B.B.'s description of the clothing his attacker was wearing. He also points to his own testimony and that of his wife denying that he possessed a shirt of the type described by B.B. The resolution of such conflicts in evidence is within the province of the jury and will not be disturbed on appeal in the absence of inherently improbable testimony which runs contrary to human experience. *Olinger v. State* (1984), Ind., 463 N.E.2d 1385. We do not find the testimony of B.B. to be of that nature and therefore will not override its acceptance by the jury. Appellant also disputes the accuracy of Bickel's diagram, contending that the time allotted for and between each event is underestimated. Appellant's counsel conducted vigorous cross-examination of all State witnesses regarding their memory of when the charted events took place, their duration, and intervening lapses of time, and a clock diagram which was constructed during the

cross-examinations and which contradicted Bickel's timetable was entered into evidence. Again, it was for the jury to determine the credibility and weight to be given to each of these exhibits. *Id.*

Appellant argues that Patricia Rhoades's testimony as to her memory of appellant's departure time, which provided the preliminary assumption upon which Captain Bickel constructed his diagram showing the relevant distances and travel time from Rhoades's home to Shanklin park to appellant's next worksite in Union, Michigan, was not worthy of credit. He contests her assertion that she remembered being on time for work that day and points out that her place of employment kept no written record which would verify the time of her arrival. He argues that her reliance on references to her workday routine and to the television show to mark the duration of appellant's presence renders her testimony inherently unbelievable. We decline appellant's invitation to this Court to judge the credibility this witness, *James*, 265 Ind. 384, 354 N.E.2d 236, and we do not find Rhoades's testimony so improbable as to run contrary to human experience such that an invasion of the province of the jury is warranted. *Olinger*, 463 N.E.2d 1385. It is clear that the evidence of identification presented by the State was such that from it a rational trier of fact would be warranted in concluding beyond a reasonable doubt that it was appellant who committed these offenses.

Appellant next asserts that two pre-trial procedures, namely, the lineup conducted on February 18, 1987, and the display of an array of handguns to the molestation victims which occurred on the same day, were impermissively suggestive. The argument is apparently that because of the alleged improprieties attending these procedures, the testimony of these witnesses regarding in-court and out-of-court identifications of appellant should have been suppressed and that, in the absence of this testimony, there would have been insufficient evidence upon which to convict.

R.F. and L.D. attended the same lineup in St. Joseph, Michigan as did B.B. R.F. and B.B. identified appellant as their attacker; L.D. was unable to identify anyone.

Appellant first argues that the lineup was unduly suggestive because the police's ability to place him in a lineup at all was based on the identification of him by R.F. in the grocery store. He characterizes this encounter as an impermissible one-on-one confrontation which should invalidate the entire lineup.

In *Norris v. State* (1976), 265 Ind. 508, 356 N.E.2d 204, the complaining witness saw a picture of the defendant in a newspaper prior to her in-court identification. The defendant argued that this constituted a suggestive out-of-court identification which warranted suppression of her in-court identification. This Court rejected this argument, stating:

> A "confrontation" as defined in [*Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)] is an occasion when a witness looks at a suspect or listens to a voice for the purpose of attempting to make an identification. One reading a newspaper ordinarily has no fore-knowledge of what he or she will find; it is not realistic to assume that if [the witness] had seen appellant's picture, she looked at it for the purpose of identifying appellant. This type of activity is not engineered by prosecution or law enforcement agencies, and therefore would not be deterred by application of *Stovall's* exclusionary rule. Finally, since newspapers are free to print what they feel is appropriate, it is difficult to imagine how this type of witness-accused contact can be avoided, and no legitimate purpose would be served by subjecting the witness' subsequent in-court identification testimony to possible exclusion. *Stovall* was aimed at the more egregious suggestiveness inherent in certain police identification procedures. Any suggestion implanted in the witness' mind by seeing a suspect's photograph in the newspaper should go to the weight, and not admissibility of the in-court identification.

*Id.* at 512–13, 356 N.E.2d at 206 (citations and quotation omitted). Likewise, here, R.F.'s presence in the grocery store was

not for the purpose of identifying his molester; it was not engineered nor could it have been prevented by law enforcement officials. An accidental crossing of paths between a child victim and his molester can in no way be likened to an improper confrontation contrived by police officials, and no legitimate purpose can be served by invalidating an otherwise proper lineup on this basis. There was no violation of appellant's constitutional rights in including him in a lineup based on R.F.'s identification of him in the grocery store.

■ Appellant next contends that two incidents which occurred shortly before B.B. viewed the lineup rendered the procedure impermissively suggestive. Where a trial court has admitted evidence of a pretrial identification of the defendant by a witness and an in-court identification of the defendant by the same witness, a reviewing court must determine whether, under the totality of the circumstances, "the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification" that the defendant was denied due process of law under the Fourteenth Amendment. *Stovall*, 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206.

■ The reviewing court must first determine whether the out-of-court procedure was conducted in "such a fashion as to lead the witness to make a mistaken identification." *Dillard v. State* (1971), 257 Ind. 282, 286, 274 N.E.2d 387, 389. The court focuses its inquiry on the facts

surrounding the pre-trial procedure, such as the manner and form in which the police asked the witness to attempt the identification and the witness's interpretation of their directives, *id.*, and whether officials singled out the defendant as the suspect they most had in mind either by their attitude displayed toward appellant, *id.; see also Little v. State* (1985), Ind., 475 N.E.2d 677, or by the physical constitution of the photo array or corporeal lineup, *see Lee v. State* (1988), Ind., 519 N.E.2d 146; *Little*, 475 N.E.2d 677. If the reviewing court finds that the totality of the circumstances surrounding the pre-trial confrontation were not impermissibly and unnecessarily suggestive, both the evidence of the out-of-court identification and the in-court identification were properly admitted by the trial court, and there is no need to proceed further. *Norris*, 265 Ind. 508, 356 N.E.2d 204.[1]

The day after R.F. identified appellant in the grocery store in Michigan, the police set up a lineup which was to be viewed by the victims in three molestation cases then under investigation. B.B.'s mother testified that on February 18, 1987, someone from the Goshen Police Department called and told her that a suspect had been apprehended in connection with another molestation case in Michigan and that she was to take B.B. to St. Joseph, Michigan to view a lineup. She went directly to B.B.'s school to get him, and when they got in the car, B.B. asked why they were going to Michigan. She testified that she responded,

---

1. Where the out-of-court procedure is found to have been unduly suggestive, due process requires that testimony regarding that out-of-court identification be suppressed. *Norris*, 265 Ind. 508, 356 N.E.2d 204. The reviewing court must then go on to determine whether the in-court identification was admissible notwithstanding the improprieties attending the out-of-court identification; in other words, whether there existed a basis for the in-court identification independent of the improper procedure such that the witness could resist any suggestiveness inherent in the police-instigated confrontation and make an accurate decision, based on that earlier contact with the perpetrator, that the person presented to him at trial was the one who committed the crime. *Dillard*, 257 Ind. at 286–87, 274 N.E.2d at 389. The focus of the court's inquiry here is on the facts surrounding the witness's observation of the perpetrator at or near the commission of the crime, including the length of time the witness was in the presence of the perpetrator and the amount of attention the witness had focused on him, the distance between the two and the lighting conditions at the time, the witness's capacity for observation and opportunity to perceive particular characteristics of the perpetrator, and the lapse of time between the crime and the subsequent identification. *Id.* Other relevant factors include the accuracy of any prior descriptions, the witness's level of certainty at the pre-trial identification, and the length of time between the crime and the identification, *Heiman v. State* (1987), Ind., 511 N.E.2d 458, and whether the witness has previously identified another person as the perpetrator. *Craig v. State* (1987), 515 N.E.2d 862.

"They have a guy.... A guy in a lineup, they want you to look at a lineup." B.B. testified that after they arrived at the police station in St. Joseph, he walked down a hallway toward the room from which he was to view the lineup. He stated that he saw two of the men who were to participate in the lineup through a partially open door. One of those men was appellant. B.B. testified further that as he subsequently looked at the full lineup of six, the fourth man in line, appellant, grinned or snickered and that then he was sure that man was the one who molested him.

■■■ Appellant argues that the accidental exposure of B.B. to two participants in the lineup apart from the other four subjects rendered the procedure unduly suggestive. A similar argument was presented in *Hegg v. State* (1987), Ind., 514 N.E.2d 1061. The defendant there was accused of robbing a man with whom he had left a tavern. The bartender, who had previously failed to pick the defendant's picture from a photo array, was to be a witness at trial. On the day of trial, she saw the defendant in the courthouse waiting room, recognized him, and immediately informed the prosecuting attorney. The trial court then admitted her in-court identification of the defendant. This Court rejected the defendant's claim that the witness's accidental viewing of him prior to her in-court identification constituted an unduly suggestive pre-trial confrontation because the witness testified that she was not acquainted with the defendant, that he was not handcuffed when she looked into the waiting room, that she did not notice a deputy sheriff sitting next to him, and that her recognition of him had not been prompted by any suggestion or urging by anyone. *Id.* at 1062.

Here, B.B. saw through a partially open door subject Nos. 3 and 4 as they waited for the lineup to start. No one directed B.B.'s attention to the doorway or to the men standing there. The men were dressed identically in prison-issued clothing, and neither was handcuffed or attended by police officers. B.B. testified that he thought No. 4, who was in fact appellant,

"looked pretty familiar" and that he made up his mind for certain when, while viewing the entire lineup, he saw a certain expression on No. 4's face. Here, as in *Hegg*, the facts presented do not support appellant's claim that this accidental exposure constituted a suggestive procedure which tainted B.B.'s subsequent identifications.

■■■ Appellant next argues that the statement made to B.B. by his mother on the way to view the lineup was equivalent to the police practice of informing a witness that a suspect was present in a lineup the witness was about to view, a practice which was condemned by this Court in *Sawyer v. State* (1973) 260 Ind. 597, 298 N.E.2d 440. In *Sawyer*, we recognized that

> [a]lthough a witness may occassionally [sic] make the assumption on his own that the police have a suspect and he is included in the display[,] the potential suggestivity of either a photograph or corporeal lineup is heightened by the police specifically telling a witness that a person who has been arrested and charged with the crime is among the group. A witness may thus be le[d] to feel that he has an obligation to choose one of the participants in the display.... Such a comment [by the police] needlessly decreases the fairness of the identification process.

*Id.* at 601–02, 298 N.E.2d at 443 (citations omitted). Although the statement at issue here is arguably suggestive, a review of the totality of the circumstances surrounding this lineup shows that any impact the statement might have had on the fairness of the identification process was negligible. On cross examination, B.B. was questioned closely as to his interpretation of his mother's statement:

Q: And in fact did your mother tell you, "They've got the guy, we've got to go up to Michigan or go up for the lineup"?

A: She said that there was a guy that, well, from what I had figured, that it sounded like there was a guy that they had found that's like him or fits the

description of what I had given or something.

Q: So we're really talking about two different things there. One, we're talking about the fact that you believe that the police must have the guy or they wouldn't be doing this, wouldn't be having this lineup?

A: I figured that they had a guy, not just the guy. I didn't know that until I saw the lineup.

B.B., R.F., and L.D. were kept separate from each other and viewed the lineup individually. Appellant and his Michigan attorney handpicked the other participants in the lineup, and the subjects were dressed identically and were astonishingly similar in terms of age, coloring, build, hair length and color, and facial hair. There is no indication in the record nor allegation in appellant's brief that the police called attention to appellant in any way or that they encouraged or pressured B.B. to choose any of the subjects. Under the totality of these circumstances, this lineup was not impermissively suggestive, and the trial court did not err in admitting evidence of this out-of-court identification. Because we find that the pre-trial procedure was not impermissively suggestive, there is no need to evaluate whether an independent basis existed for B.B.'s in-court identification, and it, too, was properly admitted by the trial court. *Norris*, 265 Ind. 508, 356 N.E.2d 204.

■ The State offered as evidence a handgun which appellant had voluntarily turned over to the police. Appellant objected to the admission of the gun as evidence going to the issue of identity and was overruled. B.B. and J.J. then testified that the gun looked like the one wielded by the man who attacked them. J.J. also testified that during the assault on him, he saw the word "Italy" engraved on the gun and indicated that there was an identical engraving on appellant's gun. R.F. testified that appellant's gun was the same gun that his attacker held.

■ Any fact which tends to connect the accused with the commission of the crime is admissible. Where there is evi-dence by direct testimony of identification of an article, submitted to prove a fact, objections to its sufficiency go to the weight rather than the admissibility of the article. *Williams v. State* (1983), Ind., 455 N.E.2d 299; *Crosson v. State* (1978), 268 Ind. 511, 376 N.E.2d 1136. Here, the direct testimony of each boy identifying appellant's gun as at least looking like the gun held by their attacker tends to connect appellant with the commission of these crimes and was therefore admissible.

■ Appellant nonetheless urges this Court to hold that this evidence should have been excluded because of a pre-trial procedure which he believes was improper. On the day of the lineup, B.B. and R.F. were shown an array of four handguns, consisting of two small revolvers, the small automatic pistol that appellant had surrendered, and a larger automatic pistol. J.J. was later shown a photograph of the array. All three boys selected appellant's gun from the array prior to trial and subsequently testified at trial as noted above. Appellant contends that this array was the functional equivalent of a corporeal lineup of human suspects and that disparities in the size and types of guns included in the array rendered it impermissively suggestive. This argument was not placed before the trial court, either by way of a pre-trial motion in limine or through objection and argument during the testimony of any of the witnesses who testified regarding the gun. Rather, appellant's sole basis for objection was that the gun was being improperly admitted as evidence of identity. Because this contention was not made in the trial court, and resolved there in the first instance, it is not now available on appeal. *Fozzard v. State* (1988), Ind., 518 N.E.2d 789.

■ Even if the above issue had been properly raised in the trial court and preserved for appeal, its proper presentation here would be to no avail. The viewing of items of physical evidence is not subject to the same due process considerations which attend a corporeal lineup. While items of physical evidence must ultimately be connected with the crime, *Glover*

*v. State* (1970), 253 Ind. 536, 255 N.E.2d 657, positive proof of identity, i.e., that the proffered item is that which was actually used in the commission of the crime, is not required. *Smith v. State* (1961), 241 Ind. 598, 172 N.E.2d 673. Rather, it is sufficient that the witness testify that the proffered item "looks like" or "is similar to" the one he saw. during the crime. Although police attempting to identify a suspect are, with limited exceptions, expected to conduct a lineup or photo array with five or more generally similar subjects, rather than a one-on-one confrontation between a suspect and a witness, *see, e.g., Porter v. State* (1979), 272 Ind. 267, 397 N.E.2d 269; *Dewey v. State* (1976), 264 Ind. 403, 345 N.E.2d 842, no such expectation arises with respect to the identification of physical evidence. Police officers routinely display an item in isolation to a witness or a victim for identification and are justified in doing so because of the tremendous burden that would be involved in assembling a "properly constituted lineup" of items of similar size, color, and type and because the actual weapons and other physical evidence associated with the commission of crimes are often concealed or destroyed.

In summary, the resolution of conflicts in the evidence and the determination of the credibility and weight to be given to the testimony of witnesses were within the province of the jury and, because none of this evidence was shown to be so improbable as to run contrary to human experience, the conclusions of the jury will not be disturbed on appeal. Further, the circumstances surrounding the out-of-court identifications were not impermissively suggestive such that suppression of the evidence of those identifications was warranted. There was sufficient evidence to warrant the conclusion of the jury to a moral certainty beyond a reasonable doubt that appellant committed these offenses.

Appellant argues that instances of prosecutorial misconduct during final argument warrant the reversal of his convictions. While summarizing the evidence of pre-trial identifications of appellant made by the four child witnesses, the prosecutor made several references to the fact that D.M.

had picked appellant out of a group of "mugshots" that had been shown to him. After the third such reference, appellant objected. In an argument to the bench, but still in front of the jury, appellant asked the court to admonish the jury to disregard the use of that word and for a mistrial. The prosecutor responded, in essence, that his use of the word was a proper characterization of the evidence because "[D.M.] said [appellant] was picked out of these pictures. What else would he have picked them out of[?]" The trial court sustained appellant's objection, but denied the motion for mistrial and did not admonish the jury, stating, "I think it's up to the jury to pick it out, to draw a conclusion from the evidence that's given to them.... I'll leave it up to the jury to determine from their remembrance of the evidence."

Appellant's argument on appeal is that the use of the word "mugshot" constituted prosecutorial misconduct in that it was a deliberate attempt to prejudice him in the eyes of the jury by implying that he had a prior criminal record. When reviewing a trial court's denial of a motion for mistrial based upon a claim of prosecutorial misconduct, we first determine whether the acts complained of did, in fact, constitute misconduct on the part of the prosecutor. *Maynard v. State* (1987), Ind., 513 N.E.2d 641. A review of the trial transcript shows that the injection of the word "mugshot" into the proceeding was a deliberate choice made by the prosecutor rather than an inadvertent reference, either by the prosecutor or a witness, and did constitute prosecutorial misconduct.

The Court must now go on to determine whether, under all the circumstances, this conduct placed appellant in a "position of grave peril to which he should not have been subjected." *Id.* at 646. The gravity of the peril is measured by its likely effect on the jury. *Coleman v. State* (1990), Ind., 558 N.E.2d 1059; *Maynard*, 513 N.E.2d 641. In support of his position, appellant cites *Fox v. State* (1980), Ind.App., 399 N.E.2d 827. In that case, a

police officer, under direct examination by the State, testified that the complaining witness had identified a photograph from "mug files." The officer had the file in hand and was prepared to leaf through it to identify which picture the witness had chosen, but was cut off by defense objection. The defendant's conviction was reversed and a new trial ordered upon a finding that he had been placed in a position of grave peril by the State. We find, however, that the facts here are more analogous to the situation presented in *Edwards v. State* (1984), Ind., 466 N.E.2d 452, where this Court distinguished *Fox* and found that a reference to "mugshots" by a State's witness on direct examination did not place the defendant in grave peril. We stated:

At most, the Officer's statement might have indicated to the jury that Defendant had had some prior police involvement. The damage, then, is the knowledge that Defendant had engaged in or was suspected of having engaged in other illegal conduct. However, by his own admission, Defendant was, and had been, engaged in the illegal sale of drugs. Under the circumstances of this case, Defendant has failed to show that he was harmed by the Officer's reference to "mug shots."

*Id.* at 454. Although the references to mugshots here present a more serious risk of peril to appellant than was the case in *Edwards,* coming as they did from the prosecutor during argument rather than from a witness during examination, it is unlikely that they exerted any substantial persuasive influence over the jury.

The mugshots referred to by the prosecutor here were not introduced into evidence, as was plainly the thwarted intention of the prosecutor in *Fox,* nor did the prosecutor here engage in the outrageous act of bringing in an official file of pictures of criminals and asking a policeman to rifle through it to find appellant's entry. Further, the jury had before it evidence that appellant was under investigation in at least five child molesting cases. During his testimony, appellant acknowledged the fact that he was a suspect in these cases, but denied committing the crimes. It

would come as no surprise to the jury that photographs, mugshots, of appellant had been taken to be displayed to the victims at some point in the course of these investigations. One other significant factor in the determination by the Court of Appeals in *Fox* that the defendant there was placed in grave peril was the fact that "the jury knew well that Mr. Garven, the victim, had problems identifying defendant Fox as his assailant. In fact, Garven had identified a juror as the perpetrator of the crime." *Fox,* 399 N.E.2d at 830. Here, the jury heard evidence that B.B. had made an unequivocal identification of appellant as his attacker in a physical lineup that was constituted to near perfection and saw him make a second unequivocal identification of him in court. Although the behavior of the prosecutor here is not to be condoned, appellant has not shown that he was harmed by the reference to "mugshots."

■ Finally, appellant argues that the trial court erred in imposing consecutive thirty-year sentences on his two convictions and that a sixty-year sentence is manifestly unreasonable given his character and the nature of his offenses. In its sentencing order, the trial court set out facts that it found to be mitigating and aggravating and stated that the aggravators and mitigators sufficiently offset one another and that imposition of the standard sentence for each conviction was appropriate. The court then ordered that appellant serve the sentences consecutively:

Two separate, distinct crimes were charged and you were found guilty by a jury of two separate, distinct crimes. I would agree with [the prosecutor's recommendation] that the sentences for the two crimes need to run consecutive and I will so order. One crime, either crime, in and of itself, is bad enough. Both crimes taken together I think in and of themselves are an aggravating circumstance. And I think another aggravating circumstance which the Court cannot ignore is the additional victims other than the one involved in this case and the other victims that the Court is aware of from different pleadings which have been filed

who did not testify. And I will find those as aggravating circumstances to justify the second sentence.

In support of his position, appellant cites *Lindsey v. State* (1985), Ind., 485 N.E.2d 102, in which this Court vacated an order of consecutive sentences imposed by this same trial court because of a lack of specificity and remanded for either a more specific order or for the imposition of concurrent sentences. Appellant argues that the sentencing order here suffers from the same infirmity and asks for the same remedy.

The defendant in *Lindsey* was convicted of two counts of rape, and the trial court, finding that no statutory aggravators existed which would support the imposition of enhanced sentences, ordered that the defendant serve consecutive standard sentences. That part of the trial court's order regarding its decision to impose consecutive sentences read, in its entirety, as follows:

> There are, however, two separate and distinct incidences of rape in this cause of action. I'm going to sentence you to the Department of Correction for 60 years; 30 years under Count I and 30 years under Count II. I will give you the 198 days good time credit that you have coming to you.

*Id.* at 108. We vacated this sentence because the "only basis in the record to support the court's imposition of consecutive sentences is there were 'two separate and distinct incidences of rape.' This offered justification does not satisfy the specificity requirement." *Id.*

The fact that this trial court employed the phrase "two separate and distinct incidences" in *Lindsey* and the phrase "two separate, distinct crimes" here does not render the orders "nearly verbatim," as appellant asserts in his brief. The order now before this Court goes beyond the bare factual statement that was found to be inadequate in *Lindsey* and indicates that the court found that the determination of guilt on both counts by the jury was relevant to its decision to impose consecutive sentences. This Court has stated that "a basis for the gross impact which consecutive sentences may have [on the total executed sentence to be served] is ... the moral principle that each separate and distinct criminal act deserves a separately experienced punishment[,]" *Starks v. State* (1988), Ind., 523 N.E.2d 735, 737, and this Court has held that trial courts may consider multiple convictions for multiple offenses as an aggravating circumstance which will support the imposition of enhanced or consecutive sentences, *Hampton v. State* (1990), Ind., 553 N.E.2d 132 (multiple crimes committed against multiple victims); *Little v. State* (1986), Ind., 501 N.E.2d 447 (multiple crimes committed against a single victim).

The trial court also based its decision to order consecutive sentences on the evidence presented at trial that appellant had committed sex offenses against other boys. This was entirely appropriate.[2] In *Russelburg v. State* (1988), Ind., 529 N.E.2d 1193, we explained that the use of uncharged crimes as aggravating circumstances is particularly appropriate in the area of sexual abuse offenses "based on the rationale

---

**2.** In my recent dissent in *Willoughby v. State* (1990), Ind., 552 N.E.2d 462, I wrote that "I find it contrary to notions of fundamental fairness to permit the State at a sentencing hearing to attempt to add years to a sentence by placing any number of uncharged crimes in issue and putting the defendant to his defense on each.... [A] police investigation must have resulted in an arrest or charge before proof of a crime not reduced to a conviction can be admitted at a sentencing hearing." *Id.* at 471 (DeBruler, J., concurring and dissenting). Here, however, the evidence of the uncharged acts upon which the trial court based its order came in during the course of the trial rather than being presented for the first time at the sentencing hearing and were properly considered in aggravation by the trial court.

Further, this Court has held that a trial court may properly consider pending charges as an aggravating circumstance. *Ashby v. State* (1988), Ind., 486 N.E.2d 469. The pre-sentence report which the trial court had before it showed two causes pending against appellant in Elkhart Superior Court, one on charges of child molesting and criminal confinement and the second on a charge of child molesting. Although the report does not reveal the names of the victims, these prosecutions are undoubtedly for the molestations of J.J. and D.M.

that prior uncharged crimes of that nature reliably indicate a high probability that the defendant will commit similar crimes in the future." *Id.* at 1197 (citing *Mahla v. State* (1986), Ind., 496 N.E.2d 568)). This rationale is borne out under the evidence presented in this case, which demonstrated an ongoing inclination on the part of appellant to accost and sexually assault young boys, quite undeterred by previous such actions and the attendant risk of discovery and prosecution.

■ Appellant argues that a sentencing court should not be allowed to consider the same aggravating and mitigating circumstances in making the distinct decisions of whether to enhance sentences and whether to run sentences concurrently or consecutively. This argument has already been decided adverse to appellant when this Court stated that "the same reasons may be used to justify both an increase of the presumptive sentence and the imposition of consecutive sentences," in *Smith v. State* (1985), Ind., 474 N.E.2d 71, 73, and need not be addressed further.

■ Appellant argues that the sentencing order is defective because there was no mention of his community service work in cub scouts and school league basketball as mitigating circumstances and because the order does not indicate that the judge considered the possibility of rehabilitation. First, a trial court is not obligated to credit or weigh evidence proffered in mitigation in the same way that the defendant does, *Hammons v. State* (1986), Ind., 493 N.E.2d 1250, and given the fact that appellant was convicted of child molesting, it is perhaps not surprising that the trial court would decline to view his civic association with children as a mitigating circumstance. Second, the fact that the trial court made note of appellant's criminal history indicates that the goal of rehabilitation was considered. *Smith*, 474 N.E.2d at 73.

Although the trial court's order is no model of drafting, it is sufficient to support the imposition of consecutive sentences.

The convictions and sentence are affirmed.

SHEPARD, C.J., and GIVAN and DICKSON, JJ., concur.

PIVARNIK, J., concurs in result with opinion.

PIVARNIK, Justice, concurring in result.

Although I view this as an excellent opinion on issues covered, I concur in result only on a seemingly small item which I fear could lead to misinterpretation and problems in future cases.

The majority finds that the statement by B.B.'s mother to him that the police "have a guy in a lineup" would amount to a statement of "suggestivity" that puts into question the defendant's identification. I disagree that the mother's statement is suggestive in the context in which it was used in this identification process.

Everyone knows that when a lineup is held there is someone in the group who is or might be a suspect. As B.B. indicated by his testimony, he assumed that was the case or they certainly wouldn't be holding a lineup and having him view it. The evil sought to be remedied by an undue suggestiveness test is the statement or inference by the police that they have the guilty party in the lineup and need only an identification from this witness to convict him. Thus, a statement to the witness that "We've got the guy here and if you can identify him we can take care of him," or "Other witnesses have identified the guy we've got in the lineup and we're confident he's the guy who assaulted you," might encourage the witness to identify one of the group and feel more comfortable doing it even though he might otherwise question such identification.

I see B.B.'s mother's statement to him as nothing more than informing him there is a lineup he is requested to view and having no suggestiveness to it whatever.

Accordingly, I concur in result only.