William L. WETHINGTON, Appellant,

v.

STATE of Indiana, Appellee.

No. 06S00–8805–CR–438.

Supreme Court of Indiana.

Oct. 4, 1990.

Allen F. Wharry, Martin & Wharry, Lebanon, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stephenson, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant William L. Wethington and David Pemberton were arrested in connection with a robbery and associated crimes which occurred on October 2, 1986. Their causes were initially joined for trial, but after Pemberton was granted a motion for severance, each was tried in a separate jury trial. Appellant was found guilty on Count I, robbery, a Class B felony, I.C. 35–42–5–1; Count II, theft, a Class D felony, I.C. 35–43–4–2; Count III, criminal confinement, a Class B felony, I.C. 35–42–3–3; and Count IV, intimidation, a Class C felony, I.C. 35–45–2–1. The trial court sentenced appellant to twenty years on Count I and four years on Count II, these sentences to run concurrently, and to twenty years on Count III and eight years on Count IV, these sentences to run consecutively to the sentences imposed on Counts I and II and to each other. Appellant therefore received an executed sentence of forty-eight years. He now brings this direct appeal, claiming that errors were committed in the contexts of 1) search and seizure, 2) pre-trial identification procedures, 3) pre-trial publicity, 4) chain of custody, 5) admission of photographs, and 6) sentencing.

Between 7:30 and 8:00 a.m. on October 2, 1986, appellant and Pemberton were walking south along State Road 39 just outside of New Brunswick. Boone County Deputy Sheriff Dennis Brannon stopped his police car near the two men and asked them where they had been and where they were going. They responded that they had been at a girlfriend's house and were on their way back to Indianapolis. Brannon testified that he told appellants that there had been a "situation that morning and that [he] would like to take them back so that the deputies could talk to them just to see if they were, in fact, maybe involved in the situation...."

The "situation" to which Brannon was referring had occurred about two hours previously at the home of Pat Adair, which was approximately three miles away from where the men were stopped. At about 6:00 a.m., two men had forced Pat and her two adult children, Danny and Dianne, to lie on their living room floor. The first man was armed with an automatic handgun, and the other was armed with a shotgun or a rifle. Pat's bedroom was ransacked by the first man, who was looking for marijuana, while the one with the shotgun stood over the Adairs. The first man found $120 in a purse and demanded to know where the marijuana was hidden. Pat told him it was in the freezer, and he took out a package of clothesline rope, cut it with a knife, and bound the hands of the Adairs. He tore up a sheet and gagged them. A blanket was then put over them, and gasoline was poured onto it from a container the intruders had brought with them. At one point, Dianne stuck her head out and was told to keep under the blanket or her head would be blown off. Both Pat and Dianne testified that they were told that they would be burned if they did not cooperate. The man with the shotgun was about to go upstairs to look for others in the house when a woman's voice called out from the porch that she had seen something, and the two men left the house. The money, in denominations of a hundred dollar bill and a twenty dollar bill, and a large freezer bag containing six smaller plastic bags of marijuana were taken. David Presley, who is Dianne's boyfriend, their child, and Presley's cousin had been upstairs throughout the incident, and after

the men left, Dianne freed herself and ran up to check on the baby. Presley exchanged shots with the departing intruders. Danny then took Dianne next door to summon the police.

Deputy Brannon was one of the officers called to the Adair residence, and on his way back to the station, he heard a police radio broadcast that "two scruffy looking hitchhikers" had been seen walking along State Road 39. After stopping appellants as noted above, he patted them down because he had noticed something protruding from above Pemberton's belt. It was a large freezer bag with six smaller plastic bags of marijuana in it. His patdown of appellant revealed an automatic handgun, a knife, some gloves, and a billfold containing some change and the following bills: one hundred, one fifty, six twenties, one five, and four ones.

Brannon then received a radio dispatch that he was to take the two men to a nearby intersection. Upon their arrival, appellant and Pemberton got out of the police car and stood behind it so that, from across the road, they were visible from the waist up. The items taken from them were placed on the hood of the car. Danny and Dianne Adair were seated in separate police cars across the road, from which they viewed the men. Upon Danny's request, his police escort drove by them so that he could get a closer look. At one point, Brannon picked up the handgun and the knife and handed them to Sheriff Ern Hudson in full view of both the Adairs.

The men then got back in the police car, and while en route to the Boone County jail, Brannon got another radio dispatch that he was to take them instead to the Center Fire Station. There, the items produced by the patdown were placed on a chest freezer in the meeting room of the station, clearly visible from a table and chairs set up in the room. In turn, Pat, Danny, and Dianne Adair were seated at the table with a police officer. The men were brought in before each victim, one at a time and accompanied by a policeman. Each walked from a side door, across the room in front of the table, then turned and walked back out the door.

### I. Search and Seizure

■ Appellant claims that the gun and knife taken from him by Deputy Brannon were the products of a warrantless search conducted without probable cause and should have been suppressed at trial. Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may make an investigatory stop and limited search of an individual, even without a warrant and in the absence of probable cause to arrest, if the police officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion" on the individual's right of privacy. *Id.* at 20–21, 88 S.Ct. at 1879–80, 20 L.Ed.2d at 906; *see also Coates v. State* (1989), Ind., 534 N.E.2d 1087; *Owens v. State* (1986), Ind., 497 N.E.2d 230.

Deputy Brannon responded to the call to investigate the crimes committed against the Adairs, but was released from the scene by Sheriff Hudson shortly after his arrival. While en route back to the jail, Brannon heard a police radio dispatch regarding two hitchhikers in the area. At that time, Brannon knew that one of the intruders had been armed with a shotgun and that two white male suspects were believed to have fled on foot through a plowed field south of the house. The woman was believed to have driven north in a blue Camaro, which Presley had seen parked in the driveway. Brannon testified that he located the hitchhikers and stated,

As I got closer I could tell that one of them had a, something sticking[,] a protusion [sic] sticking out in the front of the pants in the belt buckle area and uh, I, then their jeans were wet from about the knees down, wet and muddy, uh, which I just started putting things together. . . .

Given these circumstances and the facts known to Brannon at that time, along with the reasonable inferences to be drawn from them, Brannon was justified in stopping appellant and Pemberton to investigate fur-

ther, and under the standards set forth in *Terry,* the search and seizure at issue here was reasonable. The police dispatch alerted Brannon to the presence of two men walking in the opposite direction of a crime scene from which armed perpetrators had escaped on foot. As he pulled his car to the side of the road, Brannon noticed that both were wearing flannel shirts and jeans, which matched the description of the clothing worn by the intruders, and that their jeans were wet and muddy from the knees down, which would be consistent with having come through a plowed field. He also noticed something protruding from the belt of one of the men. A policeman may search a person prior to questioning to remove any weapons that might be used to harm the officer or to effect an escape. *Jones v. State* (1985), Ind., 472 N.E.2d 1255.

■ When Brannon put the two men in his car to transport them to the location of the first identification, he effectuated a full custodial arrest which had to be supported by probable cause. At the time Brannon made the *Terry* stop, probable cause to arrest did not exist. However, even if probable cause to arrest does not exist at the time a legitimate investigation commences, probable cause may develop during the course of that investigation. *Fyock v. State* (1982), Ind., 436 N.E.2d 1089. When Brannon discovered the handgun and marijuana during his patdown of appellant and Pemberton, probable cause to arrest was established. *Jones,* 472 N.E.2d 1255.

The items of physical evidence were not the product of an unlawful search and seizure, and the trial court did not err in denying appellant's motion to suppress their admission into evidence.

## II. Identification Procedures

■ Appellant contends that the confrontations conducted by the police at the roadside and the fire station were impermissibly suggestive and that evidence of identification resulting from these confrontations should have been suppressed. This Court must determine whether "the confrontation[s] conducted in this case [were] so unnecessarily suggestive and conducive to irreparable mistaken identification" that appellant was denied due process of law under the Fourteenth Amendment. *Dillard v. State* (1971), 257 Ind. 282, 286, 274 N.E.2d 387, 389 (quoting *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967)).

The practice of conducting a one-on-one show-up between a suspect and a victim has been widely condemned as being inherently suggestive both by the United States Supreme Court, *see Stovall, supra,* and by this Court, *see Slaton v. State* (1987), Ind., 510 N.E.2d 1343, 1348, and cases cited therein. Identification evidence gained from such show-ups, however, is not subject to a per se rule of exclusion. *Id.* Rather, the admissibility of the evidence turns on an evaluation of whether, under the totality of the circumstances, the confrontation procedure was conducted "in such a fashion as to lead the witness to make a mistaken identification," *Dillard,* 257 Ind. at 286, 274 N.E.2d at 389. In making this determination, this Court considers the factual details of how the confrontation was conducted. Any exigencies associated with the police decision to utilize a show-up procedure as opposed to other alternatives are also relevant because the admission of show-up identification evidence where the procedure occurred shortly after the commission of the crime has been approved by this Court, recognizing "the value of permitting a witness to view a suspect while the image of the perpetrator is fresh in the witness's mind," or where the circumstances rendered alternatives such as a photo or corporeal lineup impossible. *Slaton,* 510 N.E.2d at 1348 (quoting *Head v. State* (1982), Ind., 443 N.E.2d 44, 55).

The circumstances surrounding the two confrontations were as follows: Shortly after Dianne called the police, numerous law enforcement officials arrived at the Adair residence to investigate the incident. While some of the policemen searched and examined the house and grounds, other officers questioned the Adairs, and a collective description of each of the intruders

was compiled. Two hours after the commission of the crime, Danny and Dianne Adair were transported in separate police cars to an intersection near where appellants had been stopped by Deputy Brannon. Danny testified that while en route, Officer Campbell told him that they had "picked up a couple of hitchhikers and wanted us to come and see if they was the right ones that had been to our house." Dianne testified that Officer Myers "told me [on the way] that they had picked up two hitchhikers on State Road 39 and they didn't know for sure if they was the men that was at our house, they just wanted us to go look at them to make sure." There were three police cars and at least seven law enforcement officials, most of whom were in uniform, at the intersection. At the scene of the crime, the three Adairs had collectively described both of the intruders as being 5′3″ to 5′4″ tall and wearing jeans and plaid flannel shirts. At the intersection, appellant and Pemberton, both of whom are about 5′7″ tall, stood in handcuffs behind a police car and beside Deputy Brannon, who is 6′6″ tall. Brannon was not in uniform and was wearing a solid colored cotton shirt. The gun and knife taken from appellant were on the hood of Brannon's car. Both Danny and Dianne identified appellant immediately as the man with the handgun who had tied them up, but they were less sure that Pemberton was the man with the shotgun. Danny was then driven past the men for a closer look. At some point, Brannon picked up the gun and handed it to Sheriff Hudson. He then handed Hudson the knife. When Dianne saw these transactions, she told Officer Myers that those were the weapons she had seen earlier that morning.

Three hours after the commission of the crime, Pat, Danny, and Dianne Adair were taken to the Center Fire Station. Each in turn was seated at a table in the station's meeting room. Numerous police and fire officials, some in uniform, milled about the room. The gun, knife, gloves, and package of marijuana were displayed on a chest freezer such that all three victims testified that they noticed the items before the men were brought in. Pat testified that Hudson brought these items over to her to identify. Each of the victims viewed Brannon as he brought in one of the men and a captain from the Lebanon Police Department as he brought in the other. As noted previously, Brannon was not in uniform. The record does not disclose whether the Lebanon policeman was in uniform. As at the roadside, the victims positively identified appellant as the man with the handgun, but were more tentative in identifying Pemberton.

The manner in which the police conducted both of these pre-trial confrontations was egregious and is deserving of the strongest judicial condemnation. Displaying the suspects to Danny and Dianne Adair at the roadside and parading them before all three Adairs at the fire station, with the items of physical evidence so prominently featured and with so many law enforcement officials in attendance in each instance, was highly suggestive of guilt and totally unnecessary. No exigent circumstances existed which precluded setting up a properly constituted lineup for the Adairs to view, and the intervening time and events between the incident and the confrontations negated the freshness of the image in the minds of the victims as a justification for a one-on-one show-up. The testimony regarding the identification of appellant at both of the pre-trial confrontations should have been suppressed.

■ Where it is established that evidence of an out-of-court identification has been erroneously admitted based on a finding that the confrontation procedure was impermissibly suggestive, such error may be harmless constitutional error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), *see also Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), and furthermore, a subsequent in-court identification may still be admissible if the State establishes by clear and convincing evidence that an independent basis for that in-court identification exists. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Heiman v. State* (1987), Ind., 511 N.E.2d

458; *Lyons v. State* (1987), Ind., 506 N.E.2d 813. A determination that an in-court identification by a witness was properly admitted will, in many instances, render the erroneous admission of a pre-trial identification by the same witness harmless. *United States ex rel. Moore v. Illinois*, 577 F.2d 411 (7th Cir.1978).

■ The inquiry with reference to the in-court identification is whether, under the totality of the circumstances surrounding the witness's initial observation of the perpetrator at the scene of the crime, the witness could resist any suggestiveness inherent in the improper confrontation staged by the police and make an accurate decision, based on that earlier contact with the perpetrator, that the person presented to him at trial was the one who committed the crime. *Brooks v. State* (1990), Ind., 560 N.E.2d 49 n. 1; *Dillard*, 257 Ind. 282, 274 N.E.2d 387. Factors relevant to the determination of whether an independent basis exists to support the admission of the in-court identification are the amount of time the witness was in the presence of the perpetrator and the amount of attention the witness had focused on him, the distance between the two and the lighting conditions at the time, the witness's capacity for observation and opportunity to perceive particular characteristics of the perpetrator, the lapse of time between the crime and the subsequent identification, the accuracy of any prior descriptions, the witness's level of certainty at the pre-trial identification and the length of time between the crime and the identification. *Brooks*, 560 N.E.2d at 55 n. 1 (citing *Heiman*, 511 N.E.2d at 460; *Dillard*, 257 Ind. at 286–87, 274 N.E.2d at 389).

■ The evidence regarding the victims' initial observation of the intruders at the scene of the crime showed the following: At the time of the crime, it was dark outside, but the living room was illuminated by a ceiling light which was on at all times during the fifteen-minute incident. The man with the handgun, who was identified at trial by all three Adairs as appellant, was not wearing a mask and was within inches of each victim's face as he tied their hands in front of them and put gags in their mouths. None of the Adairs was blindfolded. Appellant's appearance, in terms of age, complexion, hair color and length, and facial hair and with the exception of the the the estimate of the intruder's height, corresponded roughly with the collective description of the man with the handgun which the victims had given at the scene. The description they gave of the intruder's clothing matched with appellant's attire very closely, down to the kind of shoes he was wearing. All three Adairs testified that when they saw appellant at each of the pre-trial confrontations, they were immediately certain that he was the one with the handgun, but were less sure of Pemberton's identity as the man with the shotgun. Given the totality of these circumstances, we find that there was a sufficient basis independent of the improper confrontations to support the admissibility of the in-court identifications of appellant as the perpetrator of these crimes. Then, given the additional inferences of identification stemming other sources, such as discovery of the physical items taken from him during the initial patdown, it is clear as well that the error in admitting the evidence of the pre-trial confrontations was harmless beyond a reasonable doubt.

■ Appellant also claims that these pre-trial confrontations were conducted in derogation of his constitutional rights in that he was not afforded the assistance of counsel. In *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the United States Supreme Court rejected a claim that the defendant's right to counsel under *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), had been violated because the defendant was not assisted by counsel at a pre-trial one-on-one show-up. The Court cited a long line of cases addressing the right to counsel and noted that "all of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689, 92 S.Ct.

at 1882, 32 L.Ed.2d at 417 (emphasis omitted).* The Court stated:

> [A] person's right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.
>
> . . . .
>
> The initiation of judicial criminal proceedings . . . . is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.

*Id.* at 688–90, 92 S.Ct. at 1881–82, 32 L.Ed.2d at 417–18 (citations and footnote omitted). Here, as in *Kirby*, the confrontations between appellant and the victims were conducted before the initiation of adversary proceedings, and therefore his right to counsel was not violated because it had not yet attached. *Id.; see also Bussey v. State* (1989), Ind., 536 N.E.2d 1027 (photographic array); *Peterson v. State* (1987), Ind., 514 N.E.2d 265 (corporeal lineup); *Woodard v. State* (1984), Ind., 470 N.E.2d 336 (one-on-one show-up).

In summary, the pre-trial confrontations conducted by the police in this case were impermissively suggestive, and testimony regarding identifications resulting from these procedures should have been suppressed. The in-court identifications by the victims, however, were admissible because they were supported by a basis independent of the tainted confrontations.

### III. Pre-Trial Publicity

On the first day of jury selection, appellant filed a motion for change of venue, asserting that his opportunity to receive a fair trial was precluded by information contained in three articles about the trial of his one-time co-defendant Pemberton, which had appeared in the *Lebanon Reporter*. The motion was taken under advisement by the court pending voir dire. An article in that evening's paper reported the outcome of Pemberton's trial and the status of appellant's trial and stated that appellant had "twice refused plea agreements." Before jury selection resumed the next morning, appellant filed another motion for a change of venue. During the hearing on that motion, the trial court stated that it believed the reference to the plea agreements was prejudicial to appellant. Over appellant's objection, the court then conducted its own voir dire of the eleven venire members who had been tentatively seated as jurors the day before and the remaining prospective jurors to determine whether any of them had read the article in the *Reporter* or a similar article in that day's *Indianapolis Star* or if any of them had heard a broadcast of the information on a local radio station that morning. At the close of the court's voir dire, appellant's motion was denied, and he assigns this as error.

In addition to showing the existence of prejudicial publicity, in order to prevail on appeal, appellant must show that the jurors were unable to set aside their preconceived notions of guilt and render a verdict based upon the evidence. *Burdine v. State* (1987), Ind., 515 N.E.2d 1085. A review of the transcript of the voir dire proceedings reveals that the trial court individually questioned each person who had been tentatively seated on the first day. Nine answered that they had seen neither newspaper article nor heard the radio broadcast. Two indicated that they had been exposed to only the headline in the

---

* The Court also distinguished *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), as the "only seeming deviation from this long line of constitutional decisions" based on that case's focus on the right against self-incrimination and on its limited holding. *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417.

*Reporter,* but did not read the article, believing that to do so would be inappropriate. Two of the remaining prospective jurors stated that they had read the article in the *Reporter* in its entirety, and they were immediately excused by the court. The two jurors who had seen the headline were ultimately excused on peremptory challenges. No juror who heard appellant's case had any exposure to the prejudicial information contained in the media reports. The trial court's denial of appellant's motion for change of venue was not error.

### IV. Chain of Custody

█ Testimony was adduced at trial that shots were exchanged between the retreating intruders and David Presley, who had been upstairs during the robbery. At trial, the State entered into evidence a shell casing which had been found outside the Adair house and a shell casing that had been test-fired from appellant's gun. A ballistics expert testified that the markings on the two casings matched. Appellant objected to the admission of both casings on the ground that an adequate chain of custody had not been established for either exhibit.

The State's Exhibit 3 was a plastic bag containing a .45 caliber handgun marked with the initials "E.C." Exhibit 4 was a plastic bag containing an unmarked clip and live rounds taken from the gun, a film canister which was closed with evidence sealing tape bearing the initials "E.C." and which contained a spent .45 caliber shell casing, and a sealed red box containing a spent casing that had been test-fired from the gun. Appellant argues that the State failed to establish an adequate chain of custody because the shell casings themselves were not marked.

State Police Detective Francis Shrock testified that he turned over to a crime scene technician an empty shell casing which had been found on the steps of the front porch and given to him by Kyle Sowers, David Presley's cousin, who was living with the Adairs at the time. Ed Charters, the State Police technician, testified that while he was at the scene of the crime, Deputy Brannon turned over a handgun, which Charters initialled, and that Shrock turned over a spent shell casing. He placed the casing in a film canister, closed it with evidence sealing tape, and initialled the tape. Charters testified further that he delivered to the State Police lab two bags clipped together, one containing the spent casing in the film canister and the other containing the gun, for a test to determine if the casing had been fired from that gun. The clip and live rounds were kept in the property room at the State Police post at Indianapolis during the testing. Morris Cooper testified that he is a firearms examiner with the State Police Laboratory and that he received the gun and the sealed canister containing the shell casing along with a request for a comparison examination. Cooper marked the gun and the casing with his own initials, the case number, and item numbers and conducted the test. He testified that he reached the conclusion that the submitted casing was fired from the gun by comparing it with the casing test-fired from the gun. He then replaced the submitted casing to the canister and resealed it and placed the test casing in the red box and sealed and initialled it. He then put both containers in the evidence bag and returned that bag and the bag with the gun to the locked storage area. Cooper identified the red box in State's Exhibit 4 and testified that the seal he had placed on it had not been disturbed.

█ The purpose of the chain of custody requirement is to provide reasonable assurance that exhibits have not been substituted or tampered with. *Brafford v. State* (1987), Ind., 516 N.E.2d 45. The State is not required to exclude every possibility of tampering, but the chain of custody must give reasonable assurance that the property passed through the hands of the parties in an undisturbed condition. *Id.* The chain of custody as recited above was sufficient.

█ Appellant cites *Guthrie v. State* (1970), 254 Ind. 356, 260 N.E.2d 579, for the proposition that the degree of proof required to establish a sufficient chain of custody depends on the nature of the evi-

dence and how essential the evidence is to the proof of an element of the crime, and he argues that the contested evidence was essential for the State to establish that he had been at the scene of the crime. While the shell casings and the ballistic evidence certainly strengthened the proof of appellant's presence at the Adair residence, this evidence cannot be considered essential in that the testimony of the three victims was sufficient to establish that fact.

### V. Admission of Photographs

▇▇ Over appellant's objection, the trial court admitted four photographs which depicted the Adair home and close-ups from various angles of a bullet hole in one of the walls. On appeal, appellant argues that the State did not connect the bullet hole with his gun and that the photographs were therefore irrelevant and inadmissible.

The photographs in issue here were admitted during the testimony of State Policeman Charters, the crime scene technician, who testified that the bullet hole was discovered during the investigation of the house and surrounding property. He also testified that the decision was made not to attempt to retrieve the slug from the wall due to the extensive structural damage that removal would entail.

In *Hubbard v. State* (1987), Ind., 514 N.E.2d 1263, this Court upheld the admission of certain photographs, stating:

> The admission of photographs is within the sound discretion of the trial court and the photographs are admissible if they depict an object or scene which a witness would be permitted to describe through testimony. Photographs of a crime scene are generally admissible because they are competent and relevant aids by which the jury can orient itself to best understand the evidence presented. The photographs here ... depicted the scene of the crime and the condition of the residence immediately afterwards. They tended to corroborate the victim's version that her home had been broken into from the outside. The photographs depicted certain observations of the investigative officer and were relevant to

aid the jury in understanding his testimony.

*Id.* at 1264 (citations omitted). Likewise, here, the photograph of the house and the close-ups of the bullet hole depict the scene about which Charters was testifying as he described the course of the investigation and observations made by the police at the time. Further, they tend to corroborate the testimony by the Adairs that shots were fired at the house as the intruders made their escape. The photographs were relevant and admissible, and the trial court did not err in admitting them.

### VI. Sentencing

Appellant raises numerous allegations of error concerning the sentences imposed on him by the trial court which we have consolidated into the following two: 1) that the sentences imposed violate the prohibition against double jeopardy by inflicting multiple punishments for the same acts, and 2) that the trial court erred in imposing enhanced and consecutive sentences.

### A. Double Jeopardy

▇▇ Appellant argues that the trial court erred in imposing sentences on both the theft and robbery convictions because the theft was a lesser included offense of the robbery. The charging instruments show that both charges were predicated on the taking of "$120 dollars ... in cash and a small quantity of marijuana." The State correctly concedes the validity of appellant's argument, and therefore the theft conviction and sentence must be reversed. *Bevill v. State* (1985), Ind., 472 N.E.2d 1247.

▇▇ Appellant also argues that the imposition of separate sentences for the robbery and confinement convictions violated double jeopardy. He is correct. Two offenses are the same for the purpose of double jeopardy when the same act constitutes a violation of two distinct statutory provisions which do not require proof of an additional fact. *Hall v. State* (1986), Ind., 493 N.E.2d 433 (citing *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). However, "[d]ouble

jeopardy analysis does not end with an evaluation and comparison of the statutory provisions. [Rather,] the factual bases alleged by the State in the information or indictment and upon which the charges are predicated must also be examined." *Id.* at 435.

In *Hall,* a married couple was convicted and sentenced on counts of reckless homicide and neglect of a dependent in connection with the death of their son. The neglect indictment alleged that the parents "did knowingly deprive [the child] ... of necessary support by refusal or failure to provide [him] with medical care." The reckless homicide indictment alleged that the parents "did recklessly kill ... [the child] by refusing to supply or provide [him] with necessary medical care." This Court held that the convictions on both counts could not be sustained because "it is apparent from an examination of these charges that the parents' pattern of neglect" was the gravamen of the neglect charge and that "[t]he same act resulted in or caused the death of their son," for which they were charged with reckless homicide. *Id.* at 436. The Court went on to state, "Since the Halls' continuous pattern of neglect was the factual basis for the neglect and the reckless homicide convictions, they were punished twice for the same acts. In essence, the pattern of neglect was the means by which the reckless homicide was committed." *Id.*

To sustain its burden of proof, the State must prove the existence of every material element of the charged crime beyond a reasonable doubt. *Stewart v. State* (1990), Ind., 555 N.E.2d 121 (citing *Burris v. State* (1984), Ind., 465 N.E.2d 171)). In order to obtain a conviction for robbery, the State must allege and prove that the taking of property was effectuated "(1) by using or threatening to use force on any person; or (2) by putting any person in fear." I.C. 35–42–5–1. Count I of the charging instrument read as follows:

[William L. Wethington did] knowingly or intentionally take property from another person or from the presence of another person, towit: $120.00 ... in cash and a small quantity of marijuana

from the home of Pat Adair by using or threatening the use of force on any persons, towit: Pat Adair, Dianne Adair and Danny Adair, in that [he] bound and gagged the above-named individuals, forced them to [lie] on the floor, covered them with a blanket, and poured gasoline around the area where the victims [lay]. All of the above acts were done while [Wethington was] armed with a deadly weapon, thereby committing Robbery, a Class B felony, I.C. 35–42–5–1.

Count III of the charging instrument stated:

[William L. Wethington did] knowingly or intentionally confine another person, towit: Pat Adair, Dianne Adair and Danny Adair by binding them with rope, gagging them, forcing them to lie on the floor, covering them with a blanket and pouring gasoline around the area where they lay, which events occurred within the residence of Pat Adair without the consent of said Pat Adair, Dianne Adair and Danny Adair, all while said William L. Wethington ... [was] armed with a deadly weapon, towit: a gun, thereby committing Criminal Confinement, a Class B Felony, pursuant to I.C. 35–42–3–3.

The language of the instruments under which appellant was charged makes it evident that the factual basis underlying the criminal confinement charge was the same conduct alleged by the State to establish the "by force" element necessary to support its charge of robbery, in other words, that the confinement was the force by which appellant effectuated the robbery.

The Court of Appeals recently addressed this issue in *Ryle v. State* (1990), Ind.App., 549 N.E.2d 81. There, a restaurant employee was forced to the manager's office at gunpoint by the defendant's accomplice. Ryle then pointed his gun at the manager and ordered him to open the safe. The two men took money from the safe, but were apprehended before they got out of the parking lot. Ryle was convicted of two counts of confinement and one count of robbery. The Court of Appeals affirmed Ryle's convictions for the confinement of

the employee and the robbery of the manager, but reversed his conviction for the confinement of the manager, and explained the juxtaposition between criminal confinement and robbery as follows:

> The elements of robbery ... are knowingly or intentionally taking property from the presence of another person (1) by using or threatening the use of force on any person, or (2) by putting any person in fear. IC 35-42-5-1 (1988). Necessarily or inherently included offenses are those which must first be committed in order to commit the greater offense. If property is taken from a person or from a person's presence by force, threat of force, or by placing the person in fear—i.e., where robbery is established—the element of force, whether actual, threatened, or constructive, constitutes the crime of confinement defined as a substantial interference with a person's liberty.
>
> In other words, force equals confinement, albeit brief. However, any confinement of the victim beyond that inherent in the force used to effectuate the robbery constitutes a violation of the confinement statute apart from the violation inherent in the offense of robbery.

*Id.* at 84–85 (citations and footnote omitted). Here, as in *Ryle*, there is no doubt that appellant confined the Adairs, but because the acts alleged by the State to substantiate a necessary element of the robbery charge, i.e., the force that was used to effectuate the taking, are precisely coextensive with the acts alleged as constituting a violation of the criminal confinement statute, the convictions on both counts cannot stand. The conviction and sentence on the confinement charge are reversed.

In *Flowers v. State* (1985), Ind., 481 N.E.2d 100, 106, this Court stated that

> [t]here is no jeopardy violation where two offenses share an identical element and there is a substantial overlap in the proof.... [A defendant may] select[ ] the same means to accomplish his different criminal purposes, and in so doing [may violate] more than one criminal statute. He may be convicted and sentenced for each.

Today's decision does not affect the body of case law from this Court which makes it clear that, given a single criminal transaction, a defendant may appropriately be charged with, convicted of, and sentenced for both confinement and a distinct crime which entails some sort of confinement as necessary to effectuate that crime, such as robbery or rape. *See, e.g., Jones v. State* (1988), Ind., 518 N.E.2d 479; *Purter v. State* (1987), Ind., 515 N.E.2d 858; *Gillie v. State* (1987), Ind., 512 N.E.2d 145; *Brim v. State* (1984), Ind., 471 N.E.2d 676. *See also McDonald v. State* (1987), Ind., 511 N.E.2d 1066 (separate convictions on criminal confinement and attempted battery upheld). The holding of this case is limited to instances such as this one where criminal confinement is charged along with another crime, the commission of which inherently involves a restraint on the victim's liberty, and where the language of the charging instruments makes no distinction between the factual basis for the confinement charge and the facts necessary to the proof of an element of the other crime.

■ Finally, appellant argues that intimidation is a lesser included offense of both robbery and confinement and that the trial court violated the prohibition against double jeopardy by imposing sentence on that count. This argument is without merit. As discussed previously, double jeopardy analysis entails an examination of the provisions of the relevant statutes and of the factual bases of the allegations as set forth in the charging instruments. *Hall*, 493 N.E.2d 433. Although the factual bases alleged by the State in support of both the robbery charge and the confinement charge were identical such that the violation of the confinement statute, as charged, was subsumed in the "by force" element of the robbery statute, such is not the case with respect to the intimidation charge. I.C. 35-45-2-1 states:

> (a) A person who communicates a threat to another person with the intent that:
> (1) the person engage in conduct against his will ... commits intimidation....
>
> ....

(c) "Threat" means an expression, by words or action, of an intention to: (1) unlawfully injure the person threatened or another person....

The instrument under which appellant was charged with intimidation read as follows:

[William L. Wethington did] communicate a threat to another person, towit: Pat Adair and Dianne Adair with the intent that the other person engage in conduct against her will, towit: force the aforementioned individuals to remain on the floor, bound and gagged under threat that they would be burned it they did not do as instructed and that Dianne Adair would be killed if she raised her head from the floor. Said threats were coummunicated [sic] while [Wethington was] armed with a deadly weapon, thereby committing Intimidation, a Class C Felony, pursuant to I.C. 35-45-2-1.

This charge and the robbery and confinement charges do share some factual allegations; however, an element of the intimidation statute and unique factual allegations in this charge render the crimes distinct. Therefore, appellant's conviction and sentence on the intimidation charge do not violate double jeopardy. *Flowers*, 481 N.E.2d 100. The element of intimidation which distinguishes it from both robbery and confinement is the communication of a threat to induce compliance with the communicator's will, and the factual allegations in the robbery and confinement charges do not include the verbal threats made against the victims that they would be burned or killed if they did not comply with instructions. The trial court did not violate double jeopardy by imposing sentence on appellant's conviction for intimidation.

### B. Appropriateness of Sentences

Appellant's final claim on appeal is that the trial court erred in imposing enhanced sentences on his four convictions and in ordering three of the four to be served consecutively. Because we have found that appellant's convictions and sentences on Counts II and III, theft and criminal confinement, must be reversed, the remaining sentences to be reviewed are the sentences for robbery, a Class B felony, and intimidation, a Class C felony. Class B felonies carry a presumptive sentence of ten years, which may be enhanced by up to ten years for aggravating circumstances. I.C. 35-50-2-5. Class C felonies carry a five-year presumptive sentence, which may be enhanced by up to three years for aggravating circumstances. I.C. 35-50-2-6. The trial court found aggravating circumstances to exist in this case, enhanced both sentences to the maximum allowed by law, and ordered that they be served consecutively.

 The trial court found in aggravation that appellant "knowingly and recklessly endangered the lives" of the victims and, in substantiation of this finding, set out those details concerning the commission of the crimes which indicated to the court that "[appellant] is possessed of a calloused disregard for the potential consequences of his actions." Appellant argues that this finding was improper because it is not an aggravating circumstance enumerated in I.C. 35-38-1-7(b) of the felony sentencing statute and because the gravamen of the aggravator constituted the elements of the offenses and had already been taken into account by the State in charging him with B and C felonies.

 This argument is without merit. I.C. 35-38-1-7(d) expressly states that the aggravators listed in subsection (b) of that statute "do not limit the matters that the court may consider in determining the sentence," and this Court has repeatedly held that sentencing courts are free to consider other relevant factors relating to the specific facts of the crime and the defendant's character. *See, e.g., Ballard v. State* (1988), Ind., 531 N.E.2d 196; *Miles v. State* (1984), Ind., 468 N.E.2d 1040. Further, a court may find that the factual details of the manner in which the crimes were committed constitute an aggravating circumstance as long as its finding is a particularized account of the aspects of the crime which illustrated to the court the defendant's deservedness of an enhanced sentence rather than a bare recitation of the

elements of the charges. *Bustamante v. State* (1990), Ind., 557 N.E.2d 1313.

The trial court also cited the following valid factors in support of its decision to impose an enhanced sentence: appellant's criminal history and his need of correctional or rehabilitative treatment, its belief that imposition of a reduced sentence would depreciate the seriousness of the crime, and the fact that the evidence showed that the crime was carefully planned. *See McCawley v. State* (1980), 274 Ind. 137, 409 N.E.2d 594; I.C. 35–38–1–7(b)(2) and (3).

When a sentencing court exercises its discretion to enhance a presumptive sentence, order that sentences be served consecutively, or both, the record must identify the relevant factors which underlie this decision. *Shippen v. State* (1985), Ind., 477 N.E.2d 903. Appellant correctly points out that the trial court failed to make a specific statement of the aggravating circumstances supporting its order that the sentences be served consecutively. However, the same aggravators may be used by a sentencing court to justify both the increase of the presumptive sentences and an order that they be served consecutively. *Smith v. State* (1985), Ind., 474 N.E.2d 71, and the sentencing order in this case shows that the factors cited by the court in support of the enhancement of appellant's sentences could properly have been considered as aggravating circumstances justifying the imposition of consecutive sentences as well. In a case presenting similar circumstances, this Court stated:

> Based upon this record, a remand to the trial court would accomplish no purpose other than to have the judge state that the aggravating circumstances supporting consecutive sentences also support the enhanced sentences. Thus, we find no error; however, we stress that the better and preferable practice is for the trial court to state unequivocally that the aggravating circumstances justify both the enhanced sentences and consecutive sentences.

*Forrester v. State* (1982), Ind., 440 N.E.2d 475, 488–89. Likewise, here, the trial court should have made discrete statements identifying the reasons underlying both the decision to enhance the sentences and to order their consecutive service. However, we will not remand for a correction of the sentencing order because the record amply demonstrates its appropriateness.

The convictions and sentences on Counts I and IV, robbery and intimidation, are affirmed. The convictions and sentences on Counts II and III, theft and criminal confinement, are reversed, and we therefore remand to the trial court with instructions to vacate them.

SHEPARD, C.J., and DICKSON, J., concur.

GIVAN, J., concurs in result and dissents with separate opinion, in which PIVARNIK, J., concurs.

PIVARNIK, J., dissents with separate opinion, in which GIVAN, J., concurs.

GIVAN, Justice, concurring in result and dissenting.

I cannot agree with the statement made in the majority opinion that "the pre-trial confrontations conducted by the police in this case were impermissibly suggestive, and testimony regarding identifications resulting from these procedures should have been suppressed."

The majority holds that the pretrial confrontations were conducted while displaying goods taken from the victims and found on the persons of appellant and Pemberton. While under some circumstances such display might be considered suggestive, the facts in the case at bar do not logically lead to that conclusion. At the time of the confrontations, only a short time had elapsed since the crime had been committed.

Evidence shows that appellant and Pemberton had robbed the same victims on a previous occasion. When the victims viewed the suspects, appellant immediately was identified by the victim and Pemberton was identified by one victim and after closer scrutiny was identified by a victim who had doubts upon his initial viewing. In

view of the excellent opportunity of the victims to view their assailants and the nature of their identification, it is ludicrous to believe that the presence of the stolen objects had any initial impact upon the identification.

I agree with the majority opinion that theft was included in the robbery charge and merged therein. However, I disagree with the majority in its ruling that criminal confinement was an included offense with the robbery. In so holding, the majority recognizes the long-standing rule of law stated in *Flowers v. State* (1985), Ind., 481 N.E.2d 100 that a criminal may in accomplishing his criminal purposes commit more than one criminal act and may be convicted and sentenced for each.

However, the majority holds that in the manner in which the State charged appellant, confinement was included within the robbery. It is obvious from the charging affidavit and from the facts stated that the robbery was accomplished by the use of weapons and forcing the victims to lie on the floor. The recitation of the additional fact that the perpetrators bound and gagged their victims, covered them with a blanket, and threw gasoline on them constituted a separate and distinct allegation and proof of a separate confinement committed in conjunction with the robbery.

I would affirm the conviction of confinement.

PIVARNIK, J., concurs.

PIVARNIK, Justice, dissenting.

I must dissent from the majority opinion.

I cannot agree with the majority that "the pretrial confrontations conducted by the police in this case were impermissibly suggestive, and testimony regarding identifications resulting from these procedures should have been suppressed." I join in Justice Givan's opinion concurring in result and dissenting.

I am astounded at the majority's statement in its second issue, entitled *"Identification Procedures"*:

The manner in which the police conducted both of these pre-trial confrontations

was egregious and is deserving of the strongest judicial condemnation.

On the contrary, I view this as good police work that would meet with the approval of the citizens of this State and judicial opinions of courts of all jurisdictions including the United States Supreme Court. This defendant and his accomplice were apprehended by the police about three miles from the scene of the crime two hours or less from the time of its commission. They had on their persons the items taken from the victims as well as the weapons used. It is not surprising they were found guilty by juries in view of the overwhelming evidence available.

I believe the trial court erred in imposing sentences on both the theft and robbery convictions. Otherwise I would affirm the trial court.

GIVAN, J., concurs.