## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 30 2017, 9:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Susan D. Rayl
Smith Rayl Law Office, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Algier Flippin,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

June 30, 2017

Court of Appeals Case No.
49A02-1701-CR-87

Appeal from the Marion Superior Court

The Honorable Lisa Borges, Judge

Trial Court Cause No.
49G04-1509-F3-32727

**Vaidik, Chief Judge.**

# Case Summary

[1] Algier Flippin appeals his convictions for Level 3 felony robbery and Level 3 felony attempted robbery. After the police arrested him, Flippin and two other suspects were presented to the victims in a parking lot for a show-up identification. The victims identified Flippin and one other suspect as the robbers. Flippin did not object to this evidence at trial. On appeal, he argues that the trial court committed fundamental error when it admitted the show-up identification because it was unfairly suggestive and prejudicial. Flippin also contends that, even if the show-up identification was properly admitted, the evidence is insufficient to support his convictions for robbery and attempted robbery. Finding no error and sufficient evidence, we affirm.

# Facts and Procedural History

[2] Around 6:00 p.m. on September 12, 2015, Joseph Lackner and Roy Jones were walking home from a neighborhood block party in Indianapolis. While walking along the eastern border of Garfield Park, Lackner and Jones saw a group of teens on the opposite side of the street. The teens crossed the street, surrounded Lackner and Jones, and demanded that the two men hand over their phones, wallets, and car keys. Two teens pointed guns at Lackner and Jones. Lackner handed over his iPhone, wallet, and keys. Lackner's iPhone case doubled as his wallet, which held his credit cards, driver's license, business cards, a single $100 bill, and his MIBOR realtor card. Jones was not carrying

any of the demanded items on him and turned out his pockets to show the teens that he had nothing of value on him.

[3] After taking Lackner's possessions, the teens took off to the west into Garfield Park. Lackner and Jones ran to a nearby house and called 911. The call was placed at 6:05 p.m. Lackner described the robbers as a group of four or five African-American teens who were wearing black jackets with red logos. One of the teens had dreadlocks. The 911 dispatcher relayed this information to police. While Lackner was still on the phone with 911, Indianapolis Metropolitan Police Department Officer Mark Spears, who was responding to the robbery, reported seeing a group of four African-American teens wearing black and red clothing on Pleasant Run Parkway by Garfield Park. Officer Spears was driving a fully marked police car with his lights and siren on. When the teens saw him, they took off running. While in pursuit of the teens, Officer Spears reported back to dispatch that he needed a perimeter set up to confine where the teens could run. The teens ran north to Raymond Street and continued running north along the railroad tracks. Officer Spears followed on foot and apprehended one of the teens, who was later identified as K.D. K.D. was taken into custody at 6:10 p.m.

[4] Officer Douglas Correll also responded to the robbery and began working as part of the perimeter team. A few minutes after K.D. was apprehended, Officer Correll was driving on Raymond Street, two blocks west of the railroad tracks; he looked north and saw two African-American males running to the west who matched the description of the robbers. Officer Correll stopped both individuals

and took them into custody; they were later identified as Flippin and Lamont Martin. Officer Spears later identified Flippin and Martin as two of the three teens who had evaded him. Officers never located the fourth teen.

[5] While officers were pursuing the teens, Lackner and Jones were taken back to their home. Detective Jean Burkert met with each of them separately and took their statements. Lackner said that the teen who held the gun on him had "wild hair" with "different colors in it[.]" Tr. Vol. II p. 9. During his meeting with Detective Burkert, a couple approached Lackner and gave him his driver's license and some of his personal effects they had found in Garfield Park. Detective Burkert had officers retrace the teens' westward path through the park to look for more of Lackner's possessions. Officers followed a trail of discarded items belonging to Lackner, including his business cards, MIBOR card, and his wallet/iPhone case. Along with Lackner's personal effects, officers were searching for the two guns but were unsuccessful in locating the weapons or Lackner's iPhone.

[6] After taking their statements, Detective Burkert transported Lackner and Jones, one at a time, to a parking lot just north of Garfield Park. Waiting in the lot were Officers Spears and Correll with the three suspects they had apprehended. Detective Burkert conducted a show-up identification of the suspects. "A show-up is where a crime has occurred and we either have arrestees or people that are detained that possibly match the description. We'll bring the victims or witnesses to that location, have the victim and witness make an identification right then and there." *Id.* at 121. To ensure that an individual does not feel

compelled to identify a person during a show up, Detective Burkert "always tell[s] a victim or witness that the people they are about to see may or may not be involved" and to focus on the individual's face. *Id.* The victim or witness remains in a police car, and the suspects are presented to the victim or witness, one at a time, for identification. The suspect is approximately twenty-five to thirty feet away and a spotlight is shining in their direction so that the suspect cannot see the victim or witness. The suspect will be with an officer but will not be in handcuffs to reduce the appearance of guilt. These steps were taken when Lackner and Jones participated in the show-up identifications.

[7] Jones was not able to identify any of the three suspects as having taken part in the robbery. Lackner, however, "didn't hesitate" to identify Flippin as the teen with the "wild hair" who had held a gun on him. *Id.* at 125. Flippin had multi-colored dreadlocks. State's Exs. 16, 19. Lackner mentioned to Detective Burkert that Flippin's clothes were different, but she reminded him, "you don't focus on the clothes. You focus on the face." Tr. Vol. II p. 131. Despite the clothing, Lackner was positive that Flippin was one of the robbers.

[8] Lackner was also able to identify Martin as the robber with the second gun. He was not as confident in his identification of Martin but was "in the 90 percentile." *Id.* at 23. Lackner was not able to identify K.D. as having taken part in the robbery. Detective Burkert, without checking for fingerprints, returned to Lackner all of his personal effects that the officers had recovered. Both Lackner and Jones had returned to their home by 7:30 p.m., roughly ninety minutes after calling 911.

[9] Flippin and Martin were both charged with Level 3 felony robbery (Lackner), Level 3 felony attempted robbery (Jones), and Class A misdemeanor resisting law enforcement. K.D. was charged with only resisting law enforcement. At a two-day jury trial for Flippin, the State introduced evidence of the show-up identification made by Lackner. Flippin did not object to this evidence. The jury returned guilty verdicts on all three charges. Flippin was sentenced to a total term of eighteen years, with six years suspended.

[10] Flippin now appeals.

# Discussion and Decision

[11] Flippin contends that the trial court committed fundamental error by admitting the show-up identification. In the alternative, Flippin argues that, even with the show-up identification, the evidence presented at trial is insufficient to support his convictions for robbery and attempted robbery.[1]

# I. Fundamental Error

[12] Flippin argues that the admission of the show-up identification constituted fundamental error and violated his due-process rights because it was "so extremely unfair that its use impairs the concept of ordered liberty." Appellant's Br. p. 16 (citing *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012)).

---

[1] Flippin does not challenge the sufficiency of the evidence supporting his resisting-law-enforcement conviction.

Normally, the decision to admit or exclude evidence falls within the sound discretion of the trial court, and its determination regarding the admissibility of the evidence is reviewed for an abuse of discretion. *Gordon v. State*, 981 N.E.2d 1215, 1217 (Ind. Ct. App. 2013). But where, as here, the defendant does not make a contemporaneous objection, the issue is waived. To prevail on appeal, the defendant must demonstrate fundamental error. Fundamental error is an extremely narrow exception to the waiver rule, and the defendant is faced with the "heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014). Stated another way, the defendant must show that, given the circumstances, the trial court erred when it did not raise the issue sua sponte because the alleged error was a blatant violation of due process and presented "an undeniable and substantial potential for harm." *Id.*

[13] Our Supreme Court has cautioned against the use of show-up identifications because of their inherent suggestiveness, *see Wethington v. State*, 560 N.E.2d 496, 501 (Ind. 1990), but identification evidence gathered via a show-up procedure is "not subject to a per se rule of exclusion[,]" *Gordon*, 981 N.E.2d at 1218. Instead, the admissibility of show-up identification depends on the totality of the circumstances and "whether they lead to the conclusion that the confrontation was conducted in a manner that could guide a witness into making a mistaken identification." *Id.* In determining whether the show-up identification was permissible, we consider several factors, including (1) the witness's opportunity to view the criminal during the crime, (2) the witness's

degree of attention while observing the criminal, (3) the accuracy of the witness's prior description of the criminal, (4) the witness's level of certainty when identifying the criminal, and (5) the length of time between the crime and identification. *Rasnick v. State*, 2 N.E.3d 17, 23 (Ind. Ct. App. 2013), *trans. denied.*

[14] Flippin specifically argues that the show-up identification was unduly suggestive and unnecessary as the suspects were being guarded by police officers, and Lackner and Jones were shown each suspect individually rather than in a lineup or photo array. We disagree that it was unduly suggestive. Lackner was only a few feet away from Flippin and the other teens when they robbed him and attempted to rob Jones. The robbery lasted for approximately five minutes, ample time for Lackner to imprint specific details about the robbers. Lackner gave statements to the 911 dispatcher and police that one of the teens had dreadlocks or "wild hair" with different colors in it. Later, Lackner "didn't hesitate" to identify Flippin at the show up because Flippin's hair was so distinctive—multi-colored dreadlocks. Tr. Vol. II p. 125. Despite Flippin's clothing being different, Lackner was still positive in his identification of Flippin as one of the robbers. Lackner admitted that he was not as confident when identifying Martin, and he could not identify K.D. as one of the robbers. Furthermore, only ninety minutes transpired from the time of the robbery to when Lackner and Jones were both home after viewing the suspects at the show up.

[15] Flippin also contends that the show-up identification was improper and violated his due-process rights because there was no on-going emergency at the time. Again, this entire ordeal—from the time of the robbery to when Lackner identified Flippin—transpired in under ninety minutes. Officers had a report of a group of teens walking around the Garfield Park area with guns robbing people. To determine whether they had apprehended the correct individuals, it was imperative for police to know if the armed robbers were still at large or in custody. The exigency of the situation called for an expedited identification process. *See Slanton v. State,* 510 N.E.2d 1343, 1348 (Ind. 1987) (stating that show-up identifications are proper "where circumstances rendered an alternative approach such as a line-up impossible."). Given the totality of the circumstances, we conclude that the trial court did not commit fundamental error by admitting the show-up identification.[2]

## II. Sufficiency of Evidence

[16] Flippin also argues that, even if we do not find fundamental error with regard to the show-up identification being admitted, the evidence is insufficient to support his convictions for robbery and attempted robbery. When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor determine

---

[2] Flippin raises a third argument regarding the show up: There was an inherent risk in the method of communication used by the police during the show-up proceedings. Detective Burkert communicated with Officers Spears and Correll via radio. Flippin makes a generalized argument that the use of radios "could have" led to a misidentification. Appellant's Br. p. 25. He does not cite from the record a specific miscommunication that occurred during the show up. Accordingly, this argument is waived. *See* Ind. Appellate Rule 46(A)(8)(a).

the credibility of witnesses; that role is reserved for the factfinder. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). "The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction." *Id.* A conviction will be affirmed "if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.*

[17] Flippin does not challenge the fact that Lackner was robbed and an attempted robbery was committed against Jones. Rather, he argues that there is no evidence outside of the show-up identification to tie him to these crimes. The crimes were committed by a group of four or five African-American teens, who were dressed in red and black. The teens then fled to the west through Garfield Park. While Lackner was still on the phone with the 911 dispatcher, Officer Spears saw a group of four African-American teens, who were all dressed in red and black, headed west through Garfield Park. Officer Spears was driving a marked police car with his lights and siren on, and once the teens saw him they began running. "[E]vidence of flight may be considered as circumstantial evidence of consciousness of guilt." *Myers v. State*, 27 N.E.3d 1069, 1077 (Ind. 2015). But "something more than running" is necessary to infer guilt. *Willis v. State*, 27 N.E.3d 1065, 1067 (Ind. 2015). The State presented something more: Lackner, without hesitation, identified Flippin as one of the robbers. When a victim identifies the defendant as the one who robbed him, our Supreme Court has stated that "[t]he uncorroborated testimony of the victim is sufficient to

support the conviction." *Rhyne v. State*, 446 N.E.2d 970, 972 (Ind. 1983); *see also Houze v. State*, 441 N.E.2d 1369, 1371 (Ind. 1982); *Poston v. State*, 429 N.E.2d 643, 644 (Ind. 1981). The evidence is sufficient to support Flippin's convictions for Level 3 felony robbery and Level 3 felony attempted robbery.

Affirmed.

Bailey, J., and Robb, J., concur.