## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 10 2015, 8:27 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Hilary Bowe Ricks
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jamie Carson, <br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent.* | December 10, 2015 <br><br> Court of Appeals Case No. <br> 49A05-1502-PC-69 <br><br> Appeal from the Marion <br> Superior Court <br><br> The Honorable Lisa F. Borges, <br> Judge <br><br> The Honorable Anne M. <br> Flannelly, Magistrate <br><br> Trial Court Cause No. <br> 49G04-9910-PC-189843 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, Jamie Carson (Carson), appeals the post-conviction court's denial of his petition for post-conviction relief.

We affirm, in part, reverse, in part, and remand, in part.

## ISSUE

Carson raises two issues on appeal, which we restate as the following single issue: Whether Carson was denied effective assistance of trial and appellate counsel.

## FACTS AND PROCEDURAL HISTORY

We adopt this court's statement of facts as set forth in our memorandum decision issued in Carson's direct appeal, *Carson v. State*, No. 49A05-0206-CR-260 (Ind. Ct. App. May 28, 2003), *trans. denied*:

> On October 28, 1999, at approximately 6:30 a.m., [E.H.] and [J.R.] were asleep in their apartment when three intruders, Carson, Bryant Clark [(Clark)], and Joshua Powell [(Powell)], broke in and awakened them. The intruders first went into [E.H.'s] room, where Clark pulled a gun and demanded money. Carson and Powell then started looking through [E.H.'s] room. After [E.H.] informed them that his roommate was home, the intruders then went to [J.R.'s] room and demanded money. While looking through [J.R.'s] personal belongings, Clark found gay paraphernalia. The intruders questioned him about whether he was gay to which he responded in the affirmative. They then made several "homophobic remarks," such as "fag" and "queer." [Trial Transcript pp. 49, 51].
>
> [J.R.] was then forced into [E.H.'s] room where the intruders asked [E.H.] if he too was gay. [E.H.], who was also gay, denied it because

he was scared. [E.H.] and [J.R.] were then forced, at gunpoint, to perform oral sex on each other. [E.H.] was ordered to perform anal intercourse on [J.R.], an act which they feigned. [E.H.] and [J.R.] were then tied up and repeatedly beaten. [J.R.] was kicked in the head and the groin, whipped with belts and a coat hanger, and had items thrown at him. [E.H.] was beaten in the head and kicked in the groin and ribs. [E.H.] and [J.R.] were subsequently tied together, [J.R.'s] wrists to [E.H.'s] ankles and [E.H.'s] wrists to [J.R.'s] ankles with them facing each other.

Carson retrieved a steam iron which he and Clark used to burn [J.R.] and [E.H.]. [E.H.] was burned on his shoulder, back, and buttocks. [J.R.] was burned on his back, buttocks, and the right side of his leg. [J.R.] was also forced to drink bleach, which he believes was mixed with urine. After drinking the bleach, [J.R.] began to vomit.

After beating [J.R.] and [E.H.] some more, the intruders then left the apartment, but only after setting a fire in the living room. However, the intruders came back to the apartment and put out the fire. When they returned, they also retied the restraints on [J.R.] and [E.H.], who had attempted to free themselves. After the intruders left for the final time, [J.R.] and [E.H.] untied themselves and [E.H.] called the police. A sheriff's deputy arrived at their apartment and [J.R.] and [E.H.] were taken to Wishard Hospital for treatment for the second and third degree burns they had suffered. [J.R.] was unable to walk because of the severe beating and burns he sustained on his leg. At the hospital, [J.R.] underwent two procedures to put a scope down his throat to determine if there were any burns caused by his ingestion of the bleach. [J.R.] has no lasting effects from the ingestion of the bleach, but both individuals have scars from the burns from the iron.

Carson was originally charged with thirty-seven Counts, however, on November 30, 2000, the State amended the Information charging Carson with the following seven Counts: Counts I-II, criminal deviate conduct, Class A felonies, Ind. Code § 35-42-4-2 (1998); Count III, robbery, a Class A felony,

I.C. § 35-42-5-1 (1998); Count IV, attempted robbery, a Class A felony, I.C. §§35-41-5-1; -42-5-1 (1998); Counts V-VI, criminal confinement, Class B felonies, I.C. § 35-42-3-3 (1998); and Count VII, carrying a handgun without a license, a Class A misdemeanor, I.C. § 35-47-2-1 (1998). [1]

[5] At the outset, Carson was represented by private counsel who entered his appearance on November 1, 1999. Four days later, Carson's private counsel withdrew from the case and Carson's Second Pretrial Counsel entered his appearance. While representing Carson, Second Pretrial Counsel filed several motions including a Notice of Alibi. According to the Notice, Carson was at his sister's home from October 25 through October 27, 1999. The alibi then claimed that on October 27, 1999, accompanied by Whitney Fells (Fells), Carson visited with his mother for about thirty or forty minutes. Thereafter, Carson and Fells drove to a friend's house for a party, and then to Regina Daniels'[2] (Daniels) house. Carson claimed he remained at Daniels' house until the next day. On the afternoon of October 28, 1999, in the company of others, Carson stated that he spent time at Circle Centre Mall in Indianapolis, Indiana.

---

[1] The remaining thirty Counts were not dismissed but resolved separately in a different cause.

[2] The Order denying Carson's petition for post-conviction relief refers to Daniels as 'Davis.' However, we note that at the evidentiary hearing, she is referenced as Daniels; as such, we will use that as her last name.

After that, he returned to Daniels' house and remained there until around 8:22 p.m. Carson claimed that he and Teresa Lewis (Lewis) thereafter checked in at the Signature Inn on Michigan Road and 86th Street in Indianapolis. He claimed that they spent the night at the inn until the next day, October 29, 1999.

[6] On February 12, 2001, at the pretrial hearing, Carson's Second Pretrial Counsel filed a motion to suppress and a Waiver of Trial by Jury. The trial court interrogated Carson before finding that he had knowingly, intelligently, and voluntarily waived his right to a jury trial. In July 2001, Carson's Second Pretrial Counsel withdrew from the case, and from July 2001 to November 2001, Carson was represented by two other attorneys. On December 12, 2001, Carson's fourth pretrial attorney, who ended up being Carson's Trial Counsel, entered his appearance. The record shows that Trial Counsel filed several motions including a Motion to Withdraw Waiver of Trial by Jury.

[7] On April 12, 2002, shortly before Carson's trial, the trial court heard Carson's Motion to Withdraw Waiver of Trial by Jury. The motion was denied and Carson's case proceeded to a bench trial. The State presented evidence that a day after the attack, J.R. identified Carson through a photographic array; at the live lineup, E.H. and J.R. were able to identify Carson as one of the assailants; and Carson's fingerprint was found on the steam iron that was used to burn E.H. and J.R.

[8] After the State rested its case, Carson testified with regards to his Notice of Alibi. Carson stated that on October 27, 1999, he went to his mother's house

escorted by Fells. Carson stated that he recalled that day because his mother was at home recuperating from her thyroid surgery. He further claimed that after spending about thirty or forty minutes at his mother's house, he and Fells drove to Daniels' house. Carson also indicated that Daniels' live-in-boyfriend, Antoine Goodrich (Goodrich), and two other people were present at the house. Carson specified that he left Daniels' house at around 8:00 p.m. that night and drove to a hotel. During cross-examination, Carson appeared to change his alibi, *i.e.*: that on October 27, 1999, he left his mother's house at around 10:00 p.m., he was with Fells, and they briefly detoured to another friend's house for a party before going to Daniels' house. In addition, Carson indicated that he stayed at Daniels' house until the next day, October 28, 1999. When asked if he had gone to the Circle Centre Mall on the afternoon of October 28, and then to the Signature Inn as per the Notice of Alibi, Carson responded by stating that he stayed at the inn before going to the mall. Carson did not mention spending time with Lewis from October 27 through the morning of October 28, 1999.

[9] At the conclusion of the evidence, the trial court found Carson guilty of all charges. On May 10, 2002, the trial court held a sentencing hearing. Subsequently, the trial court sentenced Carson to fifty years on Count I, to run concurrently with Count III; fifty years on Count II, to run concurrently with Count V; fifty years on Count III, to run concurrently with Count I; fifty years on Count IV, to run consecutively to Count V; ten years on Count V, to run consecutively to Count III; ten years on Count VI, to run consecutively to

Count IV; and one year on Count VII, to run concurrently with Count VI. Carson's aggregate sentence was 120 years. Carson appealed.

[10] On direct appeal, Carson argued that the trial court erred in denying his motion to withdraw waiver of trial by jury; by admitting certain pieces of evidence; that there was insufficient evidence to convict him of the charged offenses; and that his sentence was inappropriate. On May 28, 2003, we affirmed Carson's conviction and sentence.

[11] On April 16, 2004, Carson filed a *pro se* petition for post-conviction relief alleging ineffective assistance of Trial Counsel for failing to: (1) challenge pretrial identification evidence, (2) call alibi witnesses, (3) properly challenge the testimony and evidence regarding the fingerprint lifted from the steam iron, (4) advise him not to waive the jury trial; and lastly, (5) a free-standing claim of double jeopardy. On October 7, 2013, through his PCR Counsel, Carson amended his petition by narrowing the allegations to ineffective assistance of Trial Counsel for failing to present alibi witnesses at his trial, and by adding ineffective assistance of Appellate Counsel for failing to argue that the trial court erred by ordering consecutive sentences for Counts IV and V, since it exceeded the statutory limitation of fifty-five years, which is the advisory sentence for the next highest class of offense, murder. *See* I.C. § 35-50-1-2(c) (1999). October 22, 2013, the State filed its response. On January 14, 2014, the post-conviction court held Carson's evidentiary hearing. At the hearing, Carson called Second Pretrial Counsel, Trial Counsel, Appellate Counsel, and Lewis as witnesses.

[12] Carson's Second Pretrial Counsel testified that due to the passage of time, he could not recall any particulars relating to Carson's trial, but nonetheless, he indicated that if there was ever a notice of alibi filed, he would have met with the potential witnesses, but then again he had no recollection as to whether he met with any of the alibi witnesses. He further pointed out that he could not remember meeting or interviewing Lewis before Carson's trial. Lastly, Counsel testified that when he withdrew from the case, he passed on Carson's file to either Carson, Carson's family, or to Carson's replacement counsel.

[13] Carson's Trial Counsel, who represented Carson for the remainder of the pretrial period and the entire trial, stated that he recalled there being an alibi issue, but he had no recollection as to what set of charges it was designed for, or any of the witnesses' names. Hoping to refresh Trial Counsel's memory, Carson's PCR Counsel requested a recess to allow Trial Counsel to look through Carson's file. When the post-conviction court resumed, Trial Counsel stated that he found a number of his handwritten notes on the subject of potential alibi witnesses. He translated his notes by stating:

> Told [Carson] his alibi witnesses were present but could not remember anything. [Carson] told me he thought his sister would say what he wanted and I explained it does not work that way and reminded him that his sister was afraid to come to the office.
>
> Then I had a note here . . . [Carson's mother] had told her daughter not to come.
>
> Next note is: [Carson] seemed not to care if the alibi witnesses testified. . . .

There is: [Carson] . . . with my appraisal . . . suggested to send the alibi witnesses home. He said he would just testify.

(PCR Tr. pp. 82-83).[3] Trial Counsel stated that even though he spoke to several alibi witnesses before Carson's trial, he could not remember how many there were, or whether they were male or female. In addition, Trial Counsel stated that he could not remember meeting with Lewis as an alibi witness.

[14] Lewis testified that she had been requested to go the City County Building; however, she could not recall if it was to offer evidence for Carson or to give a statement. Lewis indicated that she was at the court house on at least two occasions: the first time, she was informed that the case had been deferred, and the second time, she was outside the court room and was informed that she was no longer needed. With regards to her whereabouts on October 27 through the morning of October 28, 1999 when E.R. and J.H. were attacked, Lewis stated that Carson picked her up on October 27 at around 9:00 p.m., but no later than 10:00 p.m., and that they both spent the night at Daniels' house. Lewis claimed

---

[3] Throughout this opinion, the records for the direct appeal will be referenced as "D.A.___" and the records for the post-conviction hearing will be referenced as "PCR___."

that she and Carson had sexual relations that night at Daniels' house, and she woke up the next morning at around 10:00 a.m. and left for home.

[15] Carson's Appellate Counsel explained that part of standard procedure while preparing for a direct appeal is to contact the client, read the transcript and clerk's record, research and formulate issues, and then draft and file an appellate brief. Appellate Counsel testified that while she had no specific recollection of Carson's appeal, she remembered the case in general and some of the issues that she and Carson discussed. In addition, Appellate Counsel stated that one of the four issues raised on appeal involved Carson's sentence. She testified that she suspected that she looked into the issue of Carson's sentence exceeding the sentencing cap and double jeopardy concerns and concluded that they were nonviable issues.

[16] Subsequently, both parties filed their proposed findings of fact and conclusions of law. On January 22, 2015, the post-conviction court denied Carson relief.

[17] Carson now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[18] In a post-conviction proceeding, the petitioner must establish the grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Overstreet v. State*, 877 N.E.2d 144, 151 (Ind. 2007). When challenging the denial of post-conviction relief, the petitioner appeals a negative judgment. *Overstreet*, 877 N.E.2d at 151. To prevail, the petitioner must show that the

evidence leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *Id.* We will disturb the post-conviction court's decision only where the evidence is without conflict and leads to but one conclusion and the post-conviction court reached the opposite conclusion. *Henley v. State*, 881 N.E.2d 639, 643-44 (Ind. 2008).

[19] Where the post-conviction court enters findings of fact and conclusions of law, as in the instant case, we do not defer to the post-conviction court's legal conclusions; the post-conviction court's findings and judgment will be reversed, however, only upon a showing of clear error that leaves us with a definite and firm conviction that a mistake has been made. *Overstreet*, 877 N.E.2d at 151.

## II. *Ineffective Assistance of Counsel*

[20] The standard by which we review claims of ineffective assistance of counsel is well established. In order to prevail on a claim of this nature, a defendant must satisfy a two-pronged test, showing that: (1) his counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Johnson v. State*, 832 N.E.2d 985, 996 (Ind. Ct. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 690, 694, (1984), *reh'g denied*) *reh'g denied, trans. denied*. The two prongs of the *Strickland* test are separate and independent inquiries. *Johnson*, 832 N.E.2d at 996. Thus, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Timberlake v.*

*State*, 753 N.E.2d 591, 603 (Ind. 2001) (quoting *Strickland*, 466 U.S. at 697), *reh'g denied; cert. denied*, 537 U.S. 839 (2002).

[21]   Counsel is afforded considerable discretion in choosing strategy and tactics and we will accord those decisions deference. *Id*. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id*. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. *Id*. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id*. Furthermore, we will not speculate as to what may or may not have been advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best. *Johnson*, 832 N.E.2d at 997.

### A.   *Trial Counsel*

[22]   Carson claims that he recalls asking Trial Counsel to have "Lewis, [] Daniels, and [] Goodrich" give an account of his whereabouts at his trial. (Appellant's Br. p. 14). None of the witnesses were called to testify. As such, Carson urges us to find that Trial Counsel's performance was deficient since he failed to call his alibi witnesses.

[23]   We strongly presume that counsel provided adequate assistance and exercised reasonable professional judgment in all significant decisions. *McCary v. State*,

761 N.E.2d 389, 392 (Ind. 2002). We assess counsel's conduct based upon the facts known at the time and not through hindsight. *State v. Moore*, 678 N.E.2d 1258, 1261 (Ind. 1997). As such, we do not "second-guess" strategic decisions requiring reasonable professional judgment even if the strategy in hindsight did not serve the defendant's interests. *Id.*

[24] Further, in reviewing claims of ineffective assistance, we are mindful that the failure to present an alibi defense is not necessarily ineffective assistance of counsel. *D.D.K. v. State*, 750 N.E.2d 885, 890 (Ind. Ct. App. 2001) (citing *Jones v. State*, 569 N.E.2d 975, 982-83 (Ind. Ct. App. 1991)). Absent a strong showing to the contrary, we normally presume counsel failed to present an alibi defense because it was not indicated by the circumstances or, if indicated, was rejected upon due deliberation. *Lee v. State*, 694 N.E.2d 719, 721 n.7 (Ind. 1998).

[25] Despite having three alibi witnesses—Lewis, Daniels, and Goodrich—Carson only elected to call Lewis at his evidentiary hearing. Lewis' testimony was that Carson was with her on the night of October 27, 1999 until the morning of October 28, 1999. Carson asserts that Lewis' testimony would have validated his claim that he was not at the scene of the crime on the morning of October 28, 1999.

[26] Turning to the record, we find that Lewis' testimony was contradicted numerous times by the evidence to support the conclusion that she was not a credible witness. The record shows that Carson was involved in preparing his

alibi a few months after his arrest. In the Notice of Alibi, although Carson claimed to have spent the night with Lewis at the Signature Inn, there was no mention of Lewis being with Carson at Daniels' house on the evening of October 27, 1999, until the following morning as Lewis testified at the PCR hearing. Lewis' testimony is also refuted by Trial Counsel's testimony that "alibi witnesses were present but could not remember anything." (PCR Tr. p. 83). Also, Trial Counsel indicated that Carson did not seem to care if the witnesses testified, was agreeable to the decision of sending potential witnesses home, and did not mind testifying for himself about his location during the times the crimes occurred.

[27] Lastly, we note that even if Trial Counsel called Lewis to testify consistently at Carson's trial, she would have provided an inconsistent testimony with that of Carson. Carson exhaustively testified at his own trial regarding his whereabouts on the night of October 27 through the morning of October 28, 1999. Carson failed to remark that he was with Lewis at any time on October 27, and on the morning of October 28, 1999. Instead, he testified that on October 27 he was with Fells, Daniels, Goodrich, and two other people at Daniels' house, and that he left Daniels' house at some point and spent the remainder of his night in a hotel.

[28] In addition, there was enough evidence to place Carson at the scene of the crime on October 28, 1999. At Carson's trial, the State presented evidence that J.R. positively identified Carson through a photographic array a day after the attack; both E.H. and J.R. were able to identify Carson as one of the assailants

at the live lineup; and Carson's fingerprint was found on the steam iron that was used to burn E.H. and J.R.

[29] Given the fact that Lewis' testimony falls far short of establishing that Carson was in a different location when the crimes occurred; Trial Counsel's testimony that the alibi witnesses were present but could not remember anything; and the overwhelming evidence placing Carson at the scene of the crime, we cannot say that Carson has shown that the results of his trial would have been different even if his alibi witnesses testified. Therefore, Trial Counsel did not render ineffective assistance counsel.

## B. *Appellate Counsel*

[30] Next, Carson contends that his Appellate Counsel offered him inadequate assistance on appeal. The standard by which we review claims of ineffective assistance of appellate counsel is the same standard applicable to claims of trial counsel ineffectiveness. *Wright v. State*, 881 N.E.2d 1018, 1022 (Ind. Ct. App. 2008), *reh'g denied, trans. denied*. Our supreme court identified three categories of appellate counsel ineffectiveness claims, including: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Bieghler v. State*, 690 N.E.2d 188, 193-95 (Ind. 1997), *reh'g denied, cert. denied*, 525 U.S. 1021 (1998).

[31] "To show that counsel was ineffective for failing to raise an issue on appeal, the defendant must overcome the strongest presumption of adequate assistance,

and judicial scrutiny is highly deferential." *Manzano v. State*, 12 N.E.3d 321, 329 (Ind. Ct. App. 2014). Furthermore,

> [t]o evaluate the performance prong when counsel failed to raise issues upon appeal, we apply the following test: (1) whether the unraised issues are significant and obvious from the face of the record and (2) whether the unraised issues are "clearly stronger" than the raised issues. If the analysis under this test demonstrates deficient performance, then we examine whether "the issues which . . . appellate counsel failed to raise, would have been clearly more likely to result in reversal or an order for a new trial." Ineffective assistance is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel.

*Id.* at 329-30 (internal quotation marks omitted). Here, Carson contends his Appellate Counsel was ineffective because she failed to: (1) raise the issue that his consecutive sentence for Counts IV and V exceeded the maximum sentence permissible under the consecutive sentencing statute. *See* I.C. § 35-50-1-2(c) (1999); and (2) argue that his convictions for Counts V and VI created a double jeopardy violation. We will address each issue in turn.

### 1. *Consecutive Sentencing*

[32] As noted above, Carson's sentence for attempted robbery conviction was fifty years, and his sentence for criminal confinement was ten years. The trial court ordered his fifty-year sentence to run consecutively to the ten-year sentence. It is Carson's contention that Appellate Counsel was ineffective for failing to argue that the trial court erred by ordering consecutive sentences since his sentence for the combined charges exceeded the statutory limitation of fifty-five

years, which is the advisory sentence for the next highest class of offense, murder. *See* I.C. § 35-50-1-2(c) (1999). Simply put, Carson posits that the trial court improperly ordered consecutive sentences; as such, we should find that Appellate Counsel rendered him ineffective assistance by failing to argue that issue on appeal.

[33] With respect to consecutive sentencing, Indiana Code section 35-50-1-2(c) (1999) provides, in part:

> The court may order terms of imprisonment to be served consecutively even if the sentences are not imposed at the same time. However, *except for crimes of violence*, the total of the consecutive terms of imprisonment, exclusive of terms of imprisonment under I.C. § 35-50-2-8 [(1999)] and I.C. §. 35-50-2-10 [(1999)], to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct [4] shall not exceed the advisory sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted.

(emphasis added).

[34] To develop his argument, Carson relies on *Ellis v. State*, 736 N.E.2d 731, 736 (Ind. 2000). In that case, the jury found Ellis guilty of murder, two counts of

_____

[4] As used in this section, "episode of criminal conduct" means offenses or a connected series of offenses that are closely related in time, place, and circumstance. I.C. §.35-50-1-2(b) (1999).

attempted murder, and burglary. *Id.* The trial court imposed consecutive sentences of sixty-five years for murder and fifty years for each attempted murder. *Id.* It also ordered a concurrent twenty-year sentence for burglary. The sentence thus totaled 165 years. *Id.* at 733.

[35]  In interpreting the consecutive sentencing statute, the *Ellis* court held:

> Adherence to this rule requires that we interpret the statute to exempt from the sentencing limitation (1) consecutive sentencing among crimes of violence, and (2) consecutive sentencing between a crime of violence and those that are not crimes of violence. However, the limitation should apply for consecutive sentences between and among those crimes that are not crimes of violence.

> Therefore, the trial court erred when it ordered Ellis' sentences for the two counts of attempted murder[5] to be served consecutively for a total term of 100 years. This portion of the sentence exceeded the statutory limitation. The limitation should have been fifty-five years for consecutive sentencing, *i.e.*, the presumptive sentence for the felony one class higher than attempted murder.

> The trial court did not err, however, by ordering the murder sentence served consecutively to the two counts of attempted murder without limitation. Therefore, Ellis may properly be sentenced for sixty-five years for murder, to be served consecutively with a fifty-five year

---

[5]  At the time of *Ellis*, attempted murder was not identified as a crime of violence, but it is under the current version of the statute. See I.C. §.35-50-1-2(a) (2).

sentence for the attempted murders, resulting in a total sentence of one hundred and twenty years.

*Id.* at 737-38.

[36] It is undisputed that Carson's felony convictions arose out of an episode of criminal conduct. The question here is whether the limitation upon consecutive sentencing would have applied to Carson's convictions for Counts IV and V. For the purpose of the consecutive sentencing statute, we note that when Carson was sentenced, Class A robbery was delineated as a "crime of violence." *See* I.C. § 35-50-1-2(a) (1999); however, an attempt to commit that offense was not expressly described as a crime of violence. In addition, criminal confinement, a Class B felony, was not considered a crime of violence under Indiana Code section 35-50-1-2(a) (1999). Here, Count IV attempted robbery and Count V criminal confinement are not crimes of violence. *See* I.C. § 35-50-1-2(c) (1999) (providing that limitation on consecutive sentences should apply between and among crimes that are not crimes of violence.)

[37] Notably, pursuant to *Ellis*, consecutive sentences is permissible for nonviolent crimes, however, the sentence is subject to the sentencing cap. *See Ellis,* 736 N.E.2d at 733. In this regard, we find that the trial court erred by ordering consecutive sentences since Carson's sentence for the combined charges— attempted robbery and criminal confinement—exceeded the statutory limitation of fifty-five years, which is the advisory sentence for the next highest class of offense, murder. *See* I.C. § 35-50-1-2(c) (1999).

[38] During Carson's evidentiary hearing, Appellate Counsel testified that although she had no specific recollection of Carson's appeal, she remembers the case in general and some of the issues that she and Carson discussed. She further stated that one of the four issues raised on appeal involved Carson's sentence. Again, having no specific recollection, she speculated that she may have considered Carson's sentence exceeding the sentencing cap but she never raised it.

[39] The State argues that, even if Appellate Counsel argued that the trial court erred when it ordered consecutive sentencing for attempted robbery and criminal confinement, Carson was not prejudiced as a result of the error. We disagree. As discussed above, the lengthiest consecutive sentence that Carson would have received for attempted robbery and criminal confinement was fifty-five years; thus, the trial court erred in ordering consecutive sentences totaling sixty years.

[40] Here, we find that Carson's arguments do overcome the high bar our standard of review sets when challenging appellate counsel's presentation of issues. If Appellate Counsel had presented the consecutive sentencing argument as Carson suggests, we do believe that it would have changed this court's decision in Carson's direct appeal, *i.e.,* we would have remanded this case for resentencing. Carson's claim for sentence revision and reduction did have a reasonable probability of being successful, so we find that Appellate Counsel did perform deficiently by failing to raise this claim.

[41] If we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record, we will remand for resentencing. *See Anglemyer v. State*, 868 N.E.2d 482, 490, *clarified on other grounds on reh'g*, 875 N.E.2d 218 (Ind. 2007). Accordingly, because the trial court erred in sentencing Carson to consecutive sentences amounting to sixty years, five years more than what was permissible under the consecutive sentencing statute effective on the date Carson committed the crime, we order the trial court to enter a sentence of fifty-five years.

## 2. *Double Jeopardy*

[42] Carson lastly argues that his conviction on Counts V and VI, criminal confinement, constitute double jeopardy. The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. "Indiana's Double Jeopardy Clause . . . prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Hopkins v. State,* 759 N.E.2d 633, 639 (Ind. 2001) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)). The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson*, 717 N.E.2d at 49.

[43] "An offense is the same as another under the actual evidence test when there is a reasonable possibility that the evidence used by the fact-finder to establish the essential elements of one offense may have been used to establish the essential elements of a second challenged offense." *Id.* The Indiana Supreme Court clarified this test in *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002), where it held that the test is not whether the evidentiary facts used to establish one of the essential elements of one offense may also have been used to establish one of the essential elements of a second challenged offense; rather, the test is whether the evidentiary facts establishing the essential elements of one offense also establish all of the elements of a second offense. If the evidentiary facts establishing one offense establish only one or several, but not all, of the essential elements of the second offense, there is no double jeopardy violation. *Id.*

[44] As specified in his direct appeal, Carson, while armed with a handgun, broke into E.H.'s and J.R.'s apartment. Carson then made E.H. and J.R. submit to or perform criminal deviate conduct, robbed E.H., and attempted to rob J.R. Once Carson and his accomplices completed those offenses, they subsequently confined E.H. and J.R. by tying them together with a cord. Carson was subsequently charged with: Counts I-II, criminal deviate conduct; Count III, robbery; Count IV, attempted robbery; Counts V-VI, criminal confinement; and Count VII carrying a handgun without a license.

[45] The charging information for Counts V and VI stated as follows:

> Count V
> . . . Carson, on or about October 28, 1999, did knowingly while armed

with a deadly weapon, that is: a handgun, confine [E.H.] without the consent of [E.H.], by tying [E.H.] up with a cord.

Count V
. . . Carson, on or about October 28, 1999, did knowingly while armed with a deadly weapon, that is: a handgun, confine [J.R.] without the consent of [J.R.], by tying [J.R.] up with a cord.

(D.A. App. p. 62).

[46] Carson suggests that Counts V and VI violate the actual evidence test, and he maintains that "all of the conduct constituting Counts I through IV—[two counts of] criminal deviate conduct, robbery and attempted robbery—occurred while . . . [E.H. and J.R.] were confined." (Appellant's Br. p. 23). He further suggests that his case is analogous to *Wethington v. State*, 560 N.E.2d 496, 501 (Ind. 1990), and that the trial court violated Indiana's Double Jeopardy Clause by ordering separate sentences of ten years each for his two criminal confinement convictions.

[47] In *Wethington*, two armed men broke into the house occupied by the three victims, bound the victims, and stole cash and marijuana. *Id*. at 501. The State then charged Wethington as follows:

> [Wethington did] knowingly or intentionally take property from another person or from the presence of another person, to wit: $120.00 ... in cash and a small quantity of marijuana from the home of Pat Adair by using or threatening the use of force on any persons, to wit: Pat Adair, Dianne Adair and Danny Adair, in that [he] bound and gagged the above-named individuals, forced them to [lie] on the floor, covered them with a blanket, and poured gasoline over the area where the victims [lay]. All of the above acts were done while [Wethington] was armed with a deadly weapon, thereby committing Robbery, a

Class B felony. . .

> [Wethington did] knowingly or intentionally confine another person, to wit: Pat Adair, Dianne Adair and Danny Adair by binding them with rope, gagging them, forcing them to lie on the floor, covering them with a blanket and pouring gasoline around the area where they lay, which events occurred within the residence of Pat Adair without the consent of Pat Adair, Dianne Adair and Danny Adair, all while said [] Wethington was armed with a deadly weapon, to wit: a gun, thereby committing Criminal Confinement, a Class B felony. . .

*Id*. at 507.

[48] Wethington was subsequently convicted of both offenses and received a separate sentence for each one. *Id*. On appeal, he argued that the imposition of separate sentences violated double jeopardy. *Id*. After acknowledging the statutory differences between the two offenses, our supreme court nevertheless held that sentences for both offenses violated double jeopardy because the "acts alleged by the State to substantiate a necessary element of the robbery charge, *i.e.*, the force that was used to effectuate the taking, [were] precisely co-extensive with the acts alleged as constituting a violation of the criminal confinement statute . . . ." *Id*. at 508. Our supreme court further explained:

> Today's decision does not affect the body of case law from this Court which makes it clear that, given a single criminal transaction, a defendant may properly be charged with, convicted of, and sentenced for both confinement and a distinct crime which entails some sort of confinement as necessary to effectuate that crime such as robbery or rape. The holding of this case is limited to instances such as this one where criminal confinement is charged along with another crime, the commission of which inherently involves a restraint on the victim's liberty, and where the language of the charging instruments makes no distinction between the factual basis for the confinement charge and

the facts necessary to the proof of an element of the other crime.

*Id.* (internal citations omitted).

[49] Although E.H. and J.R. were continuously confined while Carson and his accomplices effectuated the crimes of criminal deviate conduct, robbery and attempted robbery, it is possible to divide the confinement into two separate criminal transgressions. In *Boyd v. State*, 766 N.E.2d 396, 400 (Ind. Ct. App. 2002), we addressed Indiana's double jeopardy prohibition in confinement cases and applied the analytical framework espoused in *Idle v. State*, 587 N.E.2d 712, 715 (Ind. Ct. App. 1992), to determine whether two punishments had been imposed for a single confinement arising from one set of operative circumstances. The *Boyd* court found the determining factor to be "whether the confinement may be divided into two separate parts." *Boyd*, 766 N.E.2d at 400. "A confinement ends when the victim both feels and is, in fact, free from detention, and separate confinement begins if and when detention of the victim is re-established." *Id.*

[50] Unlike *Wethington*, the evidence shows that Carson's confinement of E.H. and J.R. extended beyond what was necessary to commit criminal deviate conduct, robbery and attempted robbery. Turning to the facts of the instant case, after Carson broke into E.H.'s and J.R.'s apartment, they made E.H. and J.R. perform oral and anal sex on each other, robbed E.H., and attempted to rob J.R. Thereafter, Carson and his accomplices tied up E.H. and J.R. with a cord. Both E.H. and J.R. were repeatedly beaten. J.R. was kicked in the head and

groin, and whipped with belts and a coat hanger. E.H. was also beaten in the head and kicked in the groin. Carson, with the help of his partners, retrieved a steam iron, plugged it in, and proceeded to burn E.H. and J.R. After beating E.H. and J.R. some more, Carson and his accomplices left, but only after setting a fire in the living room. A short while later, they returned to put out of the fire, and retied the restraints on J.R. and E.H. even tighter than before.

[51] When Carson and the intruders left the apartment the first time, E.H. and J.R. attempted to free themselves. At that point, E.H. and J.R. felt they were both free from detention. The second criminal confinement occurred when Carson and his accomplices returned to the apartment and retied E.H. and J.R. even tighter than before. Accordingly, we find no merit in Carson's claim that his convictions for criminal confinement violated double jeopardy. Thus, the post-conviction court did not err in rejecting Carson's claim of ineffective assistance of Appellate Counsel on this basis.

## CONCLUSION

[52] Based on the foregoing, we conclude that Carson was not denied effective assistance of Trial Counsel. However, we do conclude that Appellate Counsel offered Carson ineffective assistance for failing to argue that the sentences on Count IV, attempted robbery, and Count V, criminal confinement, exceeded the consecutive sentencing statute, and, as such, we remand to the trial court to enter a sentence of fifty-five years.

[53] Affirmed, in part, reversed, in part, and remanded.

Brown, J. and Altice, J. concur